**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
Leah Rosa Vulić (Bar No. 343520)
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@kr.law
leah@kr.law

*Attorneys for Plaintiff Logan Allec*
*and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LOGAN ALLEC**, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>**UPSIDE SERVICES, INC.**, a District of Columbia corporation,<br><br>        Defendant. | Case No. 3:23-cv-05982<br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    Plaintiff Logan Allec (hereinafter "Plaintiff" or "Allec"), on behalf of himself and all
2    others similarly situated, by and through his undersigned counsel, alleges as follows:

3                                    **INTRODUCTION**

4        1.      This is a case about a company that changed its mind about the lifetime
5    benefit it offered to consumers in order to entice them to refer friends, family, and even
6    complete strangers to use its services—after consumers had already fulfilled their end of
7    the bargain by delivering countless referrals and catapulting the company to success.

8        2.      The company in question, Defendant Upside Services, Inc. (hereinafter
9    "Upside"), offers a gas rebate service via its website <upside.com> and its mobile app,
10   which is available on both Google Play and the Apple App Store. Upside has been offering
11   its gas rebate service and corresponding referral payments to its customers who make the
12   referrals to Upside since 2016. From the start, Upside offered its referring customers
13   continued referral payments for their entire lifetime, a strategy which ensured Upside's
14   success as a business.

15       3.      After skyrocketing gas prices saw consumer interest in gas rebates skyrocket
16   during the global COVID-19 pandemic in 2020, Upside seemingly decided that it was time
17   to stop offering referring parties lifetime payments when those they referred to its services
18   used Upside to gas up.

19       4.      But Upside was not content to stop at revamping its program going forward;
20   on the contrary, it sought to unilaterally change the terms of payment for referrals made
21   under the original referral program. Despite having promised to pay its users for life for
22   users they'd referred, it now sought to renege on that promise—depriving Plaintiff and all
23   the other consumers who had enriched the company with their efforts to refer new
24   customers to Upside of the benefits to which they were legally entitled.

25                                    **PARTIES**

26       5.      Plaintiff Logan Allec is a certified public accountant ("CPA") and content
27   creator, who has acquired over 100,000 followers to his YouTube channel.

28       6.      Additionally, he is the founder of the popular personal finance website,

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1 &lt;moneydoneright.com&gt;, which at its peak saw well over 100,000 visitors per month.

2      7.    Over the years, Allec has frequently promoted Upside on both his YouTube

3 channel and on the moneydoneright.com website.

4      8.    Allec has invested financially into creating this content, including hiring third

5 parties to assist with drafting and marketing Upside-related content.

6      9.    Allec has also spent a considerable amount of time drafting and marketing

7 Upside-related content.

8      10.    As a result of these efforts and expenses, Allec's content has enticed

9 hundreds of thousands of viewers to learn about Upside's services, many of whom

10 ultimately used his referral link to sign up for the services. For instance, in November of

11 2021 alone, Allec's Upside-related webpages saw over 13,000 unique visitors.

12      11.    Defendant Upside Services, Inc., aka Upside, (which until recently was

13 named "GetUpside") is a retail technology company with a $1.5 billion valuation as of April,

14 2022.

15      12.    Upside, whose merchant network represents 25% of all convenience and fuel

16 retailers nationwide, provides a service which connects consumers to gas retailers via its

17 mobile app, which is also called Upside (the "App").

18      13.    When a consumer uses the App to purchase fuel at an Upside merchant

19 partner, that consumer then receives a cash rebate that reimburses the consumer for a

20 portion of their fuel cost.

21      14.    Today, Upside boasts over 30 million users, nearly doubles in size each year,

22 and its transactions drive over $5 billion annually in fuel purchases.

23      15.    In March of 2023, Upside raised $165 million in funding at a valuation of $1.5

24 billion.[1]

25      16.    Upside has integrated with Uber, Lyft, Instacart, and many other companies,

26 earning it the number 2 ranking in Deloitte's Fast 500 and the number 308 spot on the Inc.

27  

---

[1] https://www.upside.com/newsroom/press-releases/upside-celebrates-fastest-growth-to-date#:~:text=WASHINGTON%2C%20D.C.%2C%20October%203%2C,claims%20have%20increased%20by%2080%25.

1    5000 list in 2022.

2        17.    This tremendous growth has been accomplished in a remarkably short period

3    of time, considering that the first gas station to join Upside's network did so in May of 2016.

4                                        **JURISDICTION AND VENUE**

5        18.    Plaintiff Logan Allec lives in Los Angeles County, California, where he has

6    resided throughout his time using the Upside App and referring other users to its services.

7        19.    Defendant Upside Services, Inc. is a company incorporated and with its

8    principal place of business in the District of Columbia. However, Defendant does more than

9    operate a passive website that provides services in California—it specifically contracts with

10   California businesses and markets to California residents throughout the state, including

11   in the Northern District.

12       20.    Upside maintains a specific page on its website for California residents,

13   which shows where in the state (and in the Northern District) consumers can use its

14   services    to    obtain    discounted    gas    prices    throughout    the    state:

15   https://www.getupside.com/locations/ca/.

16       21.    In fact, Defendant has partnered with 2,162 gas stations throughout the state

17   of California to provide its cashback services to California residents.[2]

18       22.    This Court has jurisdiction over this action under the Class Action Fairness

19   Act of 2005. Pursuant to 28 U.S.C. §1332(d)(2), this Court has original jurisdiction because

20   the aggregate claims of the putative class members exceed $5 million, exclusive of interest

21   and costs, and at least one of the members of the proposed class is a citizen of a different

22   state than Defendant.

23       23.    This Court has personal jurisdiction over Upside because the claims at issue

24   arise from Upside's conduct within the State of California; namely, its advertising of its

25   services and referral program, its acceptance of referrals by California residents, and its

26   decision to stop issuing payments to California residents contrary to the terms of its prior

27   agreement with them. Upside regularly conducts business in this District, has extensive

28   _____

[2] https://www.getupside.com/locations/

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   contacts with this forum, and has purposely availed itself of the forum.

2       24.     This Court additionally has personal jurisdiction over Upside because Upside

3   has consented to be sued in this District, in accordance with the Terms of Service to which

4   it purports to bind users (its "Terms"). These Terms provide that for actions not subject to

5   arbitration, Upside's website and App users are required to bring suit in the federal or state

6   courts of the jurisdictions in which they reside. Accordingly, to the extent Upside contends

7   that its Terms apply and bind users (which Plaintiff does not concede), it has consented to

8   be sued in state and federal courts in the state where Plaintiff resides (aka California) to

9   the extent the action is not subject to arbitration.

10      25.     Venue is proper in this District under 28 U.S.C. §1391(b)(2), in that a

11  substantial part of the events or omissions giving rise to the claims occurred in this District.

12  Upside targeted advertisements regarding its services throughout the District, contracted

13  with local gas stations, and breached its agreements with California residents throughout

14  the state.

15      26.     In addition, venue is proper in this District under 28 U.S.C. §1391(b)(3), as

16  there is no district in which an action may otherwise be brought under 28 U.S.C.

17  §1391(b)(1)–(2), because Defendant is subject to this Court's personal jurisdiction.

                              **DIVISIONAL ASSIGNMENT**

19      27.     Because a substantial part of the events which give rise to Plaintiff's claims

20  occurred throughout the State of California, pursuant to Local Civil Rule 3-2(c), this action

21  should be assigned on a district-wide basis.

                              **FACTUAL ALLEGATIONS**

23      28.     To maximize its growth as a new company, Upside relied on grassroots

24  marketing efforts by users.

25      29.     To accomplish this growth, Upside adopted a unique and aggressive model

26  for new user acquisition: whenever a user successfully referred another user to the Upside

27  platform, the referring user would receive a referral bonus for every gallon of gas the

28  referred user pumped—for life.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    30.    That means that every time the referred user used Upside's services while

2  purchasing gas, **forever**, the referring user would receive a small payment, usually one to

3  two cents.

4    31.    Upside advertised this specifically as part of its "win-win-win" business

5  model:

> Once your referral becomes a GetUpside user, you'll also get a bonus for
> every gallon of gas they buy in the future, and a bonus every time one of their
> referrals gets gas. Forever!
>
> We do this because more people using GetUpside means more cash back
> for you and more profit for merchants. That's a win-win. So we want to
> encourage you to continue referring GetUpside to everyone you know.[3]

11    32.    That means that every time the referred user used Upside's services while

12  purchasing gas, **forever**, the referring user would receive a small payment, usually one to

13  two cents.

14    33.    In other words, to acquire a broader user base, Upside made the decision to

15  leverage its existing users for a grassroots marketing campaign.

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

---

[3] https://support.getupside.com/hc/en-us/articles/115004598227-What-is-GetUpside-s-referral-program-How-does-it-work- (last visited March 1, 2022).

34.     Upside aggressively advertised this referral program to users. For example, whenever users successfully made a referral, they would encounter a variation of this screen, confirming that they would receive bonuses for that referral, in perpetuity:



35.     Indeed, Upside actively encouraged consumers to purchase licensed cards, stickers, and static clings from its online web store, which could be customized with the user's individual referral code. [4]

36.     Upside encouraged users to broadly share these codes, including at gas stations (provided the users first obtained permission from the gas station to do so).

37.     Upside provided users with specific instructions on how to share their referral codes "via email, social media apps (Facebook, Twitter, etc.), chat apps (WhatsApp), or any other app on [their] phone."[5]

38.     In other words, apart from the requirement that users obtain permission

---

[4] https://web.archive.org/web/20210306172245/https://support.getupside.com/hc/en-us/articles/360041638933-Can-I-print-flyers-cards-to-advertise-my-referral-code-

[5] https://web.archive.org/web/20210528161915/https://support.getupside.com/hc/en-us

before leaving their referral codes at gas stations, there were no restrictions on Upside's referral program. Users were specifically encouraged to broadly disseminate their referral codes across social media platforms and by means of bumper stickers and referral cards.

39.    As Upside had hoped, a number of users saw this as an opportunity to earn money by leveraging their own websites, audiences, and social media followings.

40.    In exchange, these users were promised a lifetime benefit of either one cent or ½ a cent for each gallon of gas their referees pumped via Upside.

41.    Relying on these promises, countless users undertook efforts to promote Upside across numerous platforms.

42.    Countless articles and videos emerged online extolling the benefits of the Upside platform as users invested their own time and resources marketing on Upside's behalf.

43.    Content creators and website owners alike invested in driving traffic to their sites to capitalize on Upside referrals. These investments included paying for content, creating videos, writing scripts, writing articles, paying for search engine optimization, purchasing Upside-licensed stickers, paying for ads, etc.

44.    For several years, this model operated as the "win-win-win" Upside had touted it to be: the company's userbase rapidly expanded, it enjoyed favorable SEO and the benefit of thousands of positive reviews, articles, and user-created videos, and the company's profits skyrocketed as a result.

45.    All of that changed, however, in the wake of the 2020 COVID-19 pandemic.

46.    During the height of the pandemic (with its attendant travel restrictions) consumer demand for gasoline ebbed considerably. Gas prices declined, so companies like Upside relied heavily on word of mouth and community engagement to keep consumers excited about saving $0.15 to $0.25 cents per gallon.

47.    Fall of 2021, however, saw a surge in both gas pricing and consumer demand—both of which rapidly came to exceed pre-pandemic levels.[6]

---

[6] *See* https://www.reuters.com/business/energy/fossil-fuel-demand-shakes-off-pandemic-

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

48.   With gas prices rapidly approaching all-time highs, consumers were more motivated than ever before to take advantage of savings opportunities, such as Upside.

49.   Besides, by now, Upside's userbase had grown to the point that it no longer needed to rely on individual referrals in order to establish itself in the market.

50.   Upside had a problem: it no longer wanted to offer the same compensation for referrals now that it was a large enough company to acquire users on its own.

51.   However, by now, it had spent five years offering the public to issue payments "for life" for referrals.

52.   Upside decided to address this problem in true cloak-and-dagger fashion: by modifying its Terms.

53.   Historically, Upside's Terms contained only a passing reference to its referral program; it never suggested that the Terms governed the referral program. The referral program was not even included in Upside's definition of its Services:[7]

> Services Description: The Service is designed to allow you to earn Cash Back rewards on purchases you make at gas stations, grocery stores, restaurants and other participating establishments. The Service is completely free for you to use; the Cash Back rewards are offered in exchange for your loyalty to our participating merchants, subject to the terms below.

//
//
//
//
//
//
//
//
//

blow-climate-fight-2021-10-04/.

[7] https://web.archive.org/web/20210129155825/https://www.getupside.com/terms/

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

54.    On November 12, 2021, Upside—for the very first time—attempted to incorporate its referral program into its Terms, and introduced a new "affiliate program:"

**Referral and Affiliate Programs:** GetUpside offers you the opportunity to earn additional Cash Back rewards through its Referral Program, by recruiting friends and personal acquaintances to join GetUpside. You can earn a referral bonus when a new user creates a GetUpside account using your personal referral code and subsequently claims a GetUpside offer that we are able to validate. The Referral Program is only intended for referrals to friends and personal acquaintances. You are prohibited from (i) sharing your personal referral code on a website or blog, except as specified herein; (ii) purchasing advertisements featuring or promoting your personal referral code; (iii) posting your personal referral code at gas stations, restaurants, grocery stores, or other participating establishments; and (iv) otherwise disseminating or publishing your personal referral code for widespread public use. You may share your personal referral code through your own personal account(s) on social media, provided that you have fewer than 2500 followers.

Users who want to promote GetUpside beyond their friends and personal acquaintances are invited to apply to join GetUpside's Affiliate Program. You are not permitted to participate in both the Referral Program and Affiliate Program and/or claim referral bonuses through both Programs. GetUpside reserves the right in its sole discretion to change the terms of its Referral and Affiliate Programs at any time, including the amount and frequency of referral bonuses.

55.    At no point prior to November 12, 2021 had Upside reserved the right to make changes to its referral program, or the "amount and frequency of referral bonuses."

56.     At no point prior to November 12, 2021 had Upside restricted the use or dissemination of referral codes; on the contrary, it specifically invited consumers to share these as broadly as possible on social media, at businesses, via bumper stickers, and via cards that users could pay to purchase.

57.     The Terms state that changes become effective fourteen days after they are published (in this case, they became effective on November 26, 2021).

58.     On November 18, 2021 (six days after the new Terms were published), Upside's head of operations, Kristen Bierman, reached out to users, including Allec, with a targeted email that read:

> Good morning,
>
> We want to thank you for being a loyal GetUpside customer, and we would like to invite you to apply to our Affiliate Program.
>
> You've demonstrated considerable success in recruiting new users on our standard Referral Program, and we congratulate you on that success. However, we've recently made some changes to our Terms of Service to clarify that our Referral Program is intended for family and personal acquaintances only -- it is not for use on blogs or as part of other marketing behaviors. As such, we will be discontinuing your referral code on December 1. This means that new users will no longer be able to use your code to sign up for GetUpside, and the network earnings you've been receiving from past referrals will cease accruing as of November 30.
>
> Instead, we strongly encourage you to join our Affiliate Program. This program is managed through the Commission Junction affiliate platform and managed by Fiat Growth. I have copied the team on this email so they can provide specific guidance on getting started.
>
> Please let us know if you have any additional questions.
>
>
> Best,
>
> Kristen

59.     This was the first time Upside indicated to consumers that it was not only planning to revamp the referral program going forward, but planned to use this change to its Terms of Service to justify **retroactively modifying the compensation for referrals**

1    **users had already made**.

2           60.    For the first time ever, and contrary to its numerous prior representations,

3    Upside now argued that it was never its intent that users share their referral codes with the

4    public at large.

5           61.    In other words, after using consumers for years to crowdsource its marketing

6    efforts so that it could emerge as a market leader in its industry, Upside had decided to

7    stop paying its consumers according to the terms of the offer it had made to them for their

8    referrals in the first place.

9           62.    What is more, Upside did this while representing to consumers that this was

10   a mere "clarification."

11          63.    At the same time, Upside failed to make changes to relevant pages on its

12   website to "clarify" to users that it was no longer offering lifetime referral benefits.

13   Specifically, it continued to describe the lifetime benefit on its Support page and in several

14   articles posted on the website.

15          64.    In fact, as of the date of this filing, Upside's article titled, "What is Upside's

16   referral program? How does it work?" on the support page of its website continues to state,

17   "please do not post flyers or stickers with your referral code at gas stations or

18   establishments without the owner's permission."[8]

19          65.    In other words, Upside **still** tells its customers that it is okay to publish their

20   referral codes publicly as long as they have permission from the establishment where the

21   code is posted, despite its claims that the referral program is only for "friends and family."

22          66.    Upside also failed to publish any updates to landing pages where newly

23   referred users arrived on the website or on its mobile app in reliance on the grassroots

24   advertisements that they saw posted, meaning that newly referred users were oblivious to

25   this change.

26          67.    As of December 1, 2021, Upside stopped issuing any payments whatsoever

27

28   ―――――――――――――――
     [8] https://support.upside.com/hc/en-us/articles/115004598227-What-is-Upside-s-referral-
     program-How-does-it-work-

**KRONENBERGER ROSENFELD**
150 Post Street, Suite 520 San Francisco, CA 94108

for previously made referrals if it, in its sole discretion, believed that these were not payments made to friends and family members.

68.    Upon information and belief, this is true not only for users who have accessed its services since the new Terms of Service were promulgated on November 12, 2021, but for all referrals made by all users, regardless of whether Upside contends that they ever agreed to the new Terms.

69.    Additionally, as of December 1, 2021, Upside stopped crediting users for newly made referrals if it believed that these users should qualify instead for its affiliate program.

70.    However, it continued to enjoy the benefits of its consumers' marketing efforts. Despite Upside's representations in its November 18, 2021 email, which stated that user referral codes would be deactivated, the codes remained active.

71.    In other words, Upside continues to benefit from new users that found its service using content its consumers had previously invested into creating. The only difference was that, now, although new users saw that they were receiving a bonus from signing up using a referral code, the original users whose codes were being utilized were no longer receiving payments.

72.    Upon information and belief, most referring consumers were never informed by Upside about these changes to the referral program as indicated in its Terms.

73.    Upside also never contacted these referring consumers to inform them that, contrary to its representations, it had not deactivated their referral codes, or that the company was continuing to enjoy the benefit of these consumers' content.

74.    Thus, to this day, California consumers continue to be bombarded with advertisements that Upside caused to be placed throughout the state, making ongoing representations about the "lifetime" referral bonus.

75.    For example, on June 17, 2022, Channel 10 News in San Diego, California, posted a story about Upside and its referral program, stating, "Once you get on, you will be prompted to share the app with friends, which can net you and those you invite another

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

15 cents off per gallon once they make their first purchase using Upside. You also earn 1 cent off every gallon of gas they purchase in the future."[9]

76.     As of the date of this filing, the referral code promoted alongside this story remains active, meaning Upside continues to reap the benefits of such marketing efforts by signing up unsuspecting users.

77.     In other words, the public continues to receive false advertisements from Upside, and Upside continues to sign up new users which it knows, or has reason to know, were referred to it under an offer that is no longer valid. Upside does not inform newly referred users that the "lifetime" benefit of its rewards program is no longer active when they enter referral codes in reliance on such representations.

78.     In fact, users do not encounter any qualifications or disclaimers (or even Upside's Terms) when signing up for its services using the App:



---

[9] https://www.10news.com/earn-cash-back-gas-groceries-upside-app

Case No. 3:23-cv-05982

13

**COMPLAINT**

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

79. Upside allows users to continue using promo codes which it knows or has reason to know are connected with promises that it will provide them with ongoing lifetime benefits for every new user they refer—without providing any disclaimers or qualifications.

80. While any user had the opportunity to make referrals, Plaintiff Allec made an enormous number of referrals to Upside.

81. To date, Allec has acquired over 130,000 subscribers to his Logan Allec YouTube channel.

82. Additionally, Allec is the founder of the popular personal finance website, moneydoneright.com, which is owned by his company, Allec Media LLC.

83. Over the years, Allec has frequently promoted Upside on both his YouTube channel and on Allec Media's moneydoneright.com website.

84. He has invested financially into creating this content, including hiring third parties to assist with drafting and marketing Upside-related content.

85. He has also spent a considerable amount of time drafting and marketing Upside-related content.

86. All of this was done to take advantage of the same referral bonus that Upside offered to all its users, but on a larger scale.

87. For frame of reference, in November of 2021 (as Upside was disavowing the terms of its own referral program), Allec saw over 13,000 unique viewers to the page of his website that described Upside's services and included his referral code.

88. As a result of these efforts and expenses, Allec's content has enticed hundreds of thousands of viewers to learn about Upside's services.

89. For example, in March of 2021, Allec posted a video titled: "GetUpside Review: How Much I Made With GetUpside + Pros and Cons." This video alone was viewed over 66,000 times.

90. Allec's videos and articles included his Upside referral code. Each month, as Allec obtained new referrals, the size of his referral network continued to expand. Since each of these referees generated referral payments "for life," Allec's revenues continued

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1    to grow over time.

2        91.    Although each user only generated $0.005 to $0.01 per gallon of gas pumped

3    using the Upside app, by targeting a large volume of users with a specific interest in

4    financial savings, Allec was able to grow his referral network to the point that it generated

5    a significant source of revenue.

6        92.    For example, in December of 2021, although Upside was no longer paying

7    Allec for his referrals, it continued to send him daily emails updating him on his earnings

8    for the previous day under its referral program. From these emails, Allec was able to see

9    that his earnings should have been $13,996.83, just for the month of December, 2021.

10       93.    Even assuming Upside no longer gave Allec credit for any of the referrals it

11   received from his content from December 1, 2021 onward, this equates to $167,961.96 in

12   earnings per year that Allec should have continued to receive from his existing referral

13   network.

14       94.    When Allec received the November 18, 2021 email informing him of these

15   upcoming changes, he took immediate steps to protect his rights.

16       95.    Among other things, he saw that the new Terms included an opt-out

17   provision, which allowed users to opt out of the arbitration provision and class action waiver

18   contained in the Terms, provided they sent notice to Upside.

19       96.    Allec sent a written opt-out notice to Upside less than 30 days after the new

20   Terms were promulgated.

21       97.    However, Upside responded by claiming that Allec's opt-out request was

22   untimely, as it contended the opt-out provision only applied within 30 days of a user's

23   registration with Upside, or within 30 days of a prior update to the Terms which stealthily

24   introduced the opt-out provision.

25       98.    At the time Allec registered with Upside, there was no opt-out provision.

26       99.    And, of course, there had been no reference to the referral program in the

27   Terms prior to November 12, 2021.

28       100.   Notably, Upside contended that it had afforded existing users the opportunity

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   to opt out of arbitration with a prior iteration of its Terms, promulgated in October 2021.

2       101.    Upon information and belief, Upside introduced this opt-out provision, then

3   intentionally waited for thirty days for the opt-out period to expire before introducing a

4   complete overhaul of its referral program, specifically in an attempt to thwart existing

5   customer efforts to opt out of arbitration for a referral program that had never previously

6   been a part of its Terms of Service.

7       102.    In effect, this rendered the opt-out "option" inapplicable, as it was never

8   offered to Allec for any version of the Terms which referenced the referral program.

9       103.    In May of 2022, in a further effort to escape liability to Allec, Upside informed

10  Allec it was terminating his account for a breach of its Terms of Service.

11      104.    The "breach" in question was the fact that Allec's referral code, the one

12  Upside specifically told him it was deactivating, had continued to appear on Allec's

13  previously published YouTube videos.

14      105.    Upon information and belief, however, to this day, Upside continues to allow

15  individuals to sign up using such referral codes.

16      106.    And, as shown above, such links continue to remain active for others who

17  have posted about Upside's services.

18      107.    Upside could rectify this with a pop-up disclaimer whenever a user enters an

19  older referral code, or it could—as it said it would—simply disable these codes. But the

20  reality is that Upside wants to continue benefitting from new user signups, regardless of

21  whether the users are signing up under false pretenses.

22      108.    In sum, Upside used Allec and its entire consumer base to catapult itself to

23  the top. In a matter of six years, it went from being a complete unknown to a company with

24  a valuation of over $1.5 billion. It did this by offering an intentionally rich referral program

25  that fulfilled its purpose of enticing everyday users to champion Upside's services—all with

26  the promise of providing a lifetime benefit.

27      109.    Now that Upside has achieved its desired goal, however, it has decided to

28  renege on these promises.

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

110.   Upside continues to benefit from referrals made from pre-existing content created by its users, but no longer pays them, either for new referrals or for their existing ones.

111.   Upside's decision to stop paying users for referrals previously made was planned, as demonstrated by its update to the Terms to include a one-time opt-out mechanism for arbitration for existing users that expired days before it completely overhauled its existing referral program.

112.   As a result, Plaintiff and all other users who relied on Upside's promises to promote its services to the public have been, and continued to be, deprived of the funds to which they are entitled.

113.   Additionally, Upside continues to allow codes connected with false and misleading statements about its referral program to be disseminated to the California public, generating new users for its services without correcting their false understandings about how the referral program works, and it continues to host pages on its website encouraging users to post flyers and stickers with their referral codes to the public provided they have permission from the establishment owners.

114.   Accordingly, Plaintiff, the putative class, and the public have all been (and all continue to be) harmed by Upside's actions.

**CLASS ALLEGATIONS**

115.   Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of himself and the following proposed class of similarly situated individuals (the "Class"):

> All persons in California, within the applicable statute of limitations, who made referrals to Upside pursuant to its lifetime referral program.

116.   Excluded from the proposed Class is Defendant and its employees, officers, directors, legal representatives, heirs, successors, subsidiaries, and affiliates, and the judicial officers and their immediate family members and associated court staff assigned

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   to this case, as well as all persons who make a timely election to be excluded from the

2   proposed class.

3       117.   Certification of Plaintiff's claims for class-wide treatment is appropriate

4   because Plaintiff can prove the elements of his claims on a class-wide basis using the

5   same evidence that would be used to prove those elements in individual actions alleging

6   the same claims.

7       118.   This action meets all applicable standards of Fed. R. Civ. P. 23 for class

8   certification, in that Plaintiff can demonstrate the elements delineated below.

9       119.   **Numerosity.** The members of the proposed Classes are so numerous and

10  geographically dispersed that individual joinder of all proposed class members is

11  impracticable. See Fed. R. Civ. P. 23(a)(1). While Plaintiff believes that there are tens of

12  thousands of members of the proposed Class, if not more, the precise number of class

13  members is unknown, but may be ascertained from Defendant's books and records. On

14  information and belief, Defendant maintains a list of users that includes personal

15  information for the user including their email addresses, whether they have made referrals,

16  and purchases that those they referred have made.

17      120.   Applying a reasonable and prudent person standard to the users of the

18  Upside website or mobile app under the same or similar circumstances, each user would

19  qualify to be a class member requesting the right to continue receiving payments for

20  referrals made under Upside's lifetime reward program. Any reasonable and prudent

21  person under the same or similar circumstances would believe that they would receive a

22  lifetime benefit from those they referred to the program, as promised by Upside, but in

23  reality they no longer receive benefits effective December 1, 2021.

24      121.   **Commonality and Predominance.** This action involves common questions

25  of law and fact, which predominate over any questions affecting individual class members.

26  See Fed. R. Civ. P. 23(a)(2) and (b)(3). These include, without limitation:

27      a)  Whether Defendant engaged in the conduct alleged in this Complaint;

28      b)  Whether Defendant violated the applicable statutes alleged herein;

c) Whether Defendant designed, advertised, marketed, distributed, sold, or otherwise placed the Upside website and mobile App and their grassroots advertisements into the stream of commerce in the United States;

d) Whether Defendant's conduct emanated from, and/or was targeted to, the State of California;

e) Whether Plaintiff, the public, and the class members are injured and harmed directly by Defendant's false advertising designed to entice users into making in-app purchases they otherwise would not have made;

f) Whether Plaintiff and the class members are entitled to damages due to Defendant's conduct as alleged in this Complaint, and if so, in what amounts; and

g) Whether Plaintiff and members of the Classes are entitled to equitable relief, including, but not limited to, compensatory damages, a declaratory judgment, and/or injunctive relief as requested in this Complaint.

122. **Typicality**. Plaintiff's claims are typical of the putative class members' claims because, among other things, all such class members were comparably injured through Defendant's wrongful conduct as described above. See Fed. R. Civ. P. 23(a)(3). Defendant's creation and display of its misleading advertisements and its decision to stop paying users in accordance with the same is uniform for both Plaintiff and the class members.

123. **Adequacy**. Plaintiff is adequate as proposed class representative because his interests do not conflict with the interests of the other members of the proposed Classes he seeks to represent; because he has retained counsel competent and experienced in complex class action litigation; and because he intends to prosecute this action vigorously. The interests of the proposed Classes will be fairly and adequately protected by Plaintiff and his counsel. See Fed. R. Civ. P. 23(a)(4).

124. **Declaratory and Injunctive Relief**. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the proposed

1  Classes, thereby making appropriate final injunctive relief and declaratory relief, as
2  described below, with respect to the proposed Class as a whole. See Fed. R. Civ. P.
3  23(b)(2). Defendant's wrongful conduct alleged herein is grounded in the creation and
4  dissemination of its offers to provide lifetime benefits to those who referred users to its
5  program, which were displayed (and, upon information and belief, continue to be
6  displayed) uniformly. Plaintiff's and the class members' injuries are real, immediate, and
7  ongoing. Plaintiff and class members seek injunctive and declaratory relief from Defendant.

8      125.   **Superiority**. A class is superior to any other available means for the fair and
9  efficient adjudication of this controversy, and no unusual difficulties are likely to be
10  encountered in the management of this class action. The damages or other financial
11  detriment suffered by Plaintiff and putative class members are relatively small compared
12  to the burden and expense that would be required to individually litigate their claims against
13  Defendant, so it would be impracticable for members of the proposed Classes to
14  individually seek redress for Defendant's wrongful conduct. Fed. R. Civ. P. 23(b)(3).

15     126.   Applying the principles of equity or balance of equities, expecting an
16  individual plaintiff who is at a disadvantage with limited resources and spending capacity,
17  and with minimal negotiating power, if any, to litigate claims against Defendant, a
18  multibillion-dollar corporation that has immense resources and deep pockets, would be
19  unfair. Class actions are a necessary and essential means to provide for public interest
20  litigations with checks and balances to curtail deceptive practices by powerful private
21  corporations, including Defendant.

22     127.   There is no special interest in class members individually controlling the
23  prosecution of separate actions. And even if class members could afford individual
24  litigation, the court system could not. Individualized litigation creates a potential for
25  inconsistent or contradictory judgments, and it increases the delay and expense to all
26  parties and the court system. By contrast, the class action device presents far fewer
27  management difficulties and provides the benefits of single adjudication, economy of scale,
28  and comprehensive supervision by a single court. See Fed. R. Civ. P. 23(b)(3).

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**FIRST CAUSE OF ACTION**

**Violation of California's Unfair Competition Law ("UCL")**

**Cal. Business & Professions Code §§17200 *et seq.***

**(By Plaintiff, individually and on behalf of the Class)**

128.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

129.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

130.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

131.   A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

132.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

133.   Defendant has violated the "unlawful" prong under the UCL and has engaged in "unfair, deceptive, untrue or misleading" advertising.

134.   California law prohibits disseminating, or **causing to be disseminated**, any advertisements about services which are not to be performed as advertised. Cal. Bus. & Prof. Code §17500.

135.   As referenced above, Upside caused, and continues to cause, the dissemination of false statements regarding the "lifetime" benefits of its referral program.

136.   At no point did the advertisement indicate that these benefits were subject to change.

137.   At no point prior to November, 2021 did Upside ever indicate anywhere in the advertisements that it caused to be disseminated that referral rewards were subject to its Terms, or that it had the right to change such programs.

1    138.   On the contrary, Upside's own website promised that these were, in fact,

2    benefits that would be paid for life.

3    139.   As further detailed in the Second Cause of Action below, California's False

4    Advertising Law also prohibits a business from "[a]dvertising goods or services with intent

5    not to sell them as advertised," Cal. Civ. Code §1770(a)(9).

6    140.   Upside's statements were false at the time they were made or disseminated,

7    as Upside always intended to stop making payments to users once it achieved its growth

8    targets.

9    141.   This is evident from the fact that Upside described this major shift as a

10   "clarification" for how the referral program was always intended to work, after first enjoying

11   the benefit of customer sign-ups for five years.

12   142.   The statements remain false now, when the public continues to encounter

13   these statements, connected to referral codes that Upside continues to accept when

14   signing up new users—all without disavowing the prior program offers.

15   143.   Upside has also violated the "unfair" prong of the UCL by luring consumers

16   into enticing friends, family, and strangers into signing up for its services with the promise

17   of a lifetime benefit, all while (according to Upside) "reserving the right" to change the terms

18   of that offer. This right was not reserved in any of the advertisements or statements that

19   Upside made to the public, however. Upside was happy to accept the benefit of having

20   California consumers work to promote its services for years before it "clarified" how its

21   program should work.

22   144.   These acts and practices are unfair because they were likely to cause

23   consumers to falsely believe that Defendant was offering value or bargains from the

24   prevailing market value or worth of the services offered that do not, in fact, exist. As a

25   result, users who signed up for Upside's services and then referred others to Upside

26   (including Plaintiff) reasonably understood that they were receiving the promised lifetime

27   benefit for their referrals. This, in turn, has induced reasonable consumers to use and refer

28   Defendant's services when they would not otherwise have done so.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

145.    The gravity of the harm to Plaintiff and members of the Classes resulting from these unfair acts and practices outweighs any conceivable reasons, justifications, or motives that Defendant may have had for engaging in such deceptive acts and practices.

146.    Additionally, Defendant has violated the "fraudulent" prong of the UCL because its marketing and advertising materials clearly stated that there would be an unqualified lifetime benefit for every referral consumers made—when, in fact, Defendant planned to stop paying such benefits once it reached its targeted growth point.

147.    Defendant's acts and practices deceived Plaintiff and the Classes at large. Specifically, Plaintiff and the Classes relied on these misleading and deceptive representations in using Upside and in referring others to its services. Each of these representations and deceptions played a substantial role in Plaintiff's decisions to use the Upside app and to refer others to do the same—sometimes at their own expense, such as by purchasing branded content that contained their referral codes.

148.    Plaintiff and the Classes never received the benefit of their bargains with Defendant, in that Defendant has stopped issuing payments for these "lifetime" benefits since December, 2021.

149.    As a result of these violations under each of the fraudulent, unfair, and unlawful prongs of the UCL, Defendant has been unjustly enriched at the expense of Plaintiff and members of the proposed Classes. Specifically, Defendant has been unjustly enriched by obtaining users, revenues, and profits that they would not otherwise have obtained absent Defendant's false, misleading, and deceptive conduct.

150.    Through its unfair acts and practices, Defendant has improperly obtained referrals from Plaintiff and the class members. As such, Plaintiff requests that this Court cause Defendant to pay the accrued "lifetime" referral rewards to Plaintiff and all class members, and to enjoin them from continuing to violate the UCL, and/or from violating the UCL in the future. Otherwise, Plaintiff, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

1

**SECOND CLAIM FOR RELIEF**

2

**Violation of California's False Advertising Law ("FAL")**

3

**Cal. Business & Professions Code §§17500 *et seq.***

4

**(By Plaintiff, individually and on behalf of the Class)**

5       151.   Plaintiff incorporates by reference all allegations in this Complaint and

6   restates them as if fully set forth herein.

7       152.   The FAL prohibits making, disseminating, or causing to be disseminated

8   unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false

9   statements as to worth, value, and former price.

10      153.   The lifetime referral program that Upside advertised to consumers made no

11  reference to any subsequent modifications or to Upside's ability to alter the same, nor did

12  it suggest that Upside could, at any point, stop payments for previously made referrals.

13      154.   Through its unfair acts and practices, Defendant has improperly obtained a

14  benefit from Plaintiff and the class members, at their expense, in that it induced them to

15  make referrals in reliance on its representations. As such, Plaintiff requests that this Court

16  cause Defendant to pay any amounts that should have been paid had the lifetime referral

17  program operated as advertised to Plaintiff and all class members, and to prevent

18  Defendant from continuing to violate the FAL, and/or from violating the FAL in the future.

19  Otherwise, Plaintiff, the class members, and members of the general public may be

20  irreparably harmed and/or denied an effective and complete remedy if such an order is not

21  granted.

22

**THIRD CAUSE OF ACTION**

23

**Violation of the California Consumers Legal Remedies Act ("CLRA")**

24

**Cal. Civ. Code. §§1750 *et seq.***

25

**(By Plaintiff, individually and on behalf of the Class)**

26      155.   Plaintiff incorporates by reference all allegations in this Complaint and

27  restates them as if fully set forth herein.

28      156.   Plaintiff and the other class members are consumers within the meaning of

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    Cal. Civ. Code §1761(d) and have engaged in a transaction within the meaning of Cal. Civ.

2    Code §§1761(e) and 1770.

3         157.   Defendant is a "person" within the meaning of Cal. Civ. Code §§1761(c) and

4    1770, and it offers "goods or services" within the meaning of Cal. Civ. Code §§1761(a)–(b)

5    and 1770.

6         158.   The Upside website and the App are a "good" or "service" within the meaning

7    of Cal. Civ. Code. §§1761(a) and (b).

8         159.   Defendant has violated Cal. Civ. Code. §1770(a)(9)'s proscription against

9    advertising goods or services with intent not to sell them as advertised. The lifetime referral

10   advertisements did not include any indication that Upside could ever alter or stop payments

11   for referrals, once made, and yet Upside never intended for these to provide the advertised

12   lifetime benefit.

13        160.   Defendant has violated Cal. Civ. Code. §1770(a)(14)'s proscription against

14   representing that a transaction conferred rights or obligations that it did not have. The

15   advertising of the referral program indicated Upside would pay consumers every time a

16   referred user purchased gas using Upside in the future, "forever," and yet Upside made

17   these statements while purportedly reserving its right to modify the terms of that

18   advertisement at any time—including as to referrals already made—effectively rendering

19   the "forever" language of its advertisements false.

20        161.   Defendant has violated Cal. Civ. Code. §1770(a)(16)'s proscription against

21   representing that the subject of a transaction has been supplied in accordance with a

22   previous representation when it has not by purporting that its changes to the referral

23   program are a "clarification."

24        162.   Defendant has violated Cal. Civ. Code. §1770(a)(17)'s proscription against

25   representing that the consumer will receive an economic benefit, if the earning of said

26   benefit is contingent on an event to occur subsequent to the consummation of the

27   transaction, by misrepresenting that the referring party will receive a lifetime benefit every

28   time a referred consumer purchases gas but omitting Defendant's position that this was

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  subject to Upside continuing to offer the referral program.

2      163.   Plaintiff and the other class members suffered actual damages as a direct
3  and proximate result of Defendant's actions, concealment, and/or omissions in the
4  advertising, marketing, and promotion of its referral program, in violation of the CLRA, as
5  evidenced by the substantial sums Defendant pocketed from Plaintiff and the class
6  members.

7      164.   Plaintiff, on behalf of himself and the class members, demands judgment
8  against Defendant for injunctive relief and attorney's fees.

9                         **FOURTH CAUSE OF ACTION**

10                                **Fraud**

11          **(By Plaintiff, individually and on behalf of the Class)**

12     165.   Plaintiff incorporates by reference all allegations in this Complaint and
13  restates them as if fully set forth herein.

14     166.   Defendant represented to Plaintiff that it would provide him a lifetime benefit
15  for every user he referred to Upside, forever, without qualification.

16     167.   These representations were false because Upside has now stopped issuing
17  payments for previously made referrals.

18     168.   These representations were false when made, because Upside always
19  intended to stop providing the promised lifetime benefit, as demonstrated by its email
20  stating that it was "clarifying" how the referral program was intended to work, and by its
21  decision to amend its Terms in back-to-back amendments to frustrate consumers' ability
22  to pursue their claims against it for these changes, and by Upside's new assertion that it
23  "reserves the right" to make changes to the referral program—an assertion that never
24  existed before November, 2021. These actions demonstrate that Upside acted with intent,
25  and that it had planned to defraud consumers by luring them in with promises it never
26  intended to keep.

27     169.   Plaintiff and the class members reasonably relied upon the claims made in
28  Defendant's advertisements in referring users to Upside.

170.   Plaintiff and the class members were harmed because, had they known Defendant's claims were false, they would not have invested time, effort, and expense into referring others to use Upside's services.

171.   Plaintiff's reliance on Defendant's misrepresentations was a substantial factor in causing harm to Plaintiff.

172.   Additionally, Defendant continues to sign up new California users who sign up in reliance on persistent advertising regarding its lifetime benefit program.

173.   Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and the class members and will continue to both damage Plaintiff and the class members and deceive the public unless enjoined by this Court.

## FIFTH CAUSE OF ACTION

## Unjust Enrichment

## (By Plaintiff, individually and on behalf of the Class)

174.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

175.   Defendant misrepresented the existence of a lifetime benefit in its referral program.

176.   Plaintiff has spent thousands of dollars in advertising efforts for Upside, induced by Defendant's promise for lifetime referral benefits. Plaintiff and the class members' expenditure of time and effort (and money) on referring users has netted Defendant hundreds of thousands if not millions of users, thereby enriching Defendant.

177.   It would be unfair for Defendant to keep the money it has received as a result of these referrals without compensating Plaintiff and the putative class.

178.   Accordingly, Plaintiff and the class members are entitled to receive compensation for the benefit they have conferred.

//

//

//

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**SIXTH CAUSE OF ACTION**

**Breach of Contract**

**(By Plaintiff Individually, and on behalf of the Class)**

179.   Plaintiff incorporates the allegations stated in the preceding paragraphs as though fully set forth herein.

180.   When Upside extended an offer to pay users on specified terms ($0.005 to $0.01 per gallon of gas that a referred user purchased using Upside's services, forever) it provided clear terms of acceptance: the user had only to make a referral.

181.   Upon making a referral, Upside's users accepted by performance, creating a valid and binding contract.

182.   Plaintiff and the class members substantially performed all conditions, covenants, and promises to be performed by them under the terms of this agreement.

183.   Upside has breached the agreement by stopping payment on previously made referrals, even as the referred users continue to purchase gas using the Upside services.

184.   Plaintiff and the class members have been damaged in an amount to be proven at trial as a direct and proximate result of Upside's breach of the agreement.

185.   Plaintiff and the class members' damages are ongoing and increasing.

186.   Accordingly, Defendant is liable to Plaintiff and the class members for breach of contract.

**SEVENTH CAUSE OF ACTION**

**Breach of the Covenant of Good Faith and Fair Dealing**

**(Brought by Plaintiff Individually and on behalf of the Class)**

187.   Plaintiff incorporates the allegations stated in the preceding paragraphs as though fully set forth herein.

188.   Upside has a binding and valid agreement with its users, as set forth above, to pay them for each gallon of gas a user they referred makes using the Upside services.

189.   These agreements are subject to an implied covenant of good faith and fair

1   dealing that all parties would act in good faith and with reasonable efforts to perform their

2   contractual duties—both explicit and fairly implied—and not to impair the rights of other

3   parties to receive the rights, benefits, and reasonable expectations under the agreement.

4   These included the covenant that Upside would act fairly and in good faith in carrying out

5   its contractual obligations to Plaintiff and the class members.

6   190.   Upside breached the implied covenant of good faith and fair dealing by

7   frustrating the purpose for which the parties entered into the agreement; namely, to create

8   the "win-win-win" situation where users helped Upside grow, and Upside rewarded users

9   for their efforts.

10   191.   Plaintiff and the class members met all or substantially all of their contractual

11   obligations under the agreements.

12   192.   If Upside had acted in good faith, Plaintiff and the class members would have

13   been entitled to receive a portion of the proceeds of any gas purchases made, for any

14   users they referred while Upside's referral program included a lifetime benefit.

15   193.   Instead, Upside attempted to modify these existing agreements by changing

16   the Terms of Service on its website, then informing users that these changes retroactively

17   applied to the referrals they had already made.

18   194.   Upside further informed users that this was merely a "clarification," implying

19   that this was always how the program had worked, in spite of its numerous actions and

20   statements to the contrary.

21   195.   For example, Upside indicated in its "clarification" that the program was

22   always intended to apply only for referrals made to friends and family, despite having

23   offered branded marketing materials for users to purchase to advertise Upside's services

24   and provide their referral codes to the public.

25   196.   Upside also suggested it had the right to reserve this program, when it had

26   never reserved such a right for itself at the time that users made their referrals in the first

27   place.

28   197.   Upside also informed users that if they wished to continue receiving

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1  payments for previously made referrals, they would need to enter into an affiliate

2  agreement and join its new affiliate program.

3      198.   Upside's failure to act in good faith denied Plaintiff and the class members of

4  the full benefit of the bargain under the agreement.

5      199.   Accordingly, Plaintiff and the class members have been injured as a direct

6  and proximate result of Upside's breach of the covenant of good faith and fair dealing, and

7  are entitled to damages in an amount to be proven at trial.

8  **EIGHTH CAUSE OF ACTION**

9  **Conversion**

10  **(By Plaintiff Individually and on Behalf of the Class)**

11      200.   Plaintiff incorporates the allegations stated in the preceding paragraphs as

12  though fully set forth herein.

13      201.   Plaintiff and the class members had a right to possess the funds associated

14  with gas purchases made by referred users.

15      202.   Upside substantially interfered with Plaintiff and the class members' property

16  by knowingly or intentionally taking possession of these funds, preventing Plaintiff and the

17  class members from having access to the property. Defendant converted this property by

18  using it for its own gain.

19      203.   Plaintiff and the class members did not consent to the conversion of their

20  property.

21      204.   As a direct and proximate result of Defendant's conversion of their property,

22  Plaintiff and the class members have been damaged in an amount to be proven at trial.

23  **PRAYER FOR RELIEF**

24      WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his

25  favor and against Defendant Upside Services, Inc. and award the following relief to Plaintiff

26  and against Defendant:

27      a) Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil

28          Procedure, appointing Plaintiff as representative of the Class, and

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

designating Plaintiff's counsel as class counsel;

b) Awarding Plaintiff and the class members compensatory damages and actual damages in an amount exceeding $5,000,000, to be determined by proof;

c) Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

d) For punitive damages;

e) For civil penalties;

f) For declaratory and equitable relief, including a declaration that Defendant violated and has continued to violate California's UCL, the FAL, and the CLRA, and an injunction requiring Defendant to comport with California Business & Professions Code §§17200, *et seq*., and restitution and disgorgement;

g) For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein, including to cease causing false advertisements to be disseminated to the California public;

h) Awarding Plaintiff and the class members the costs of prosecuting this action, including expert witness fees;

i) Awarding Plaintiff and the class members' reasonable attorney's fees and costs as allowable by law;

j) Awarding Plaintiff and the class members reasonable attorney's fees pursuant to Cal. Civ. Proc. Code 1021.5, as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorney's fees;

k) Awarding Plaintiff and the class members reasonable attorney's fees and costs, as well as injunctive relief, pursuant to the CLRA;

l) Awarding pre-judgment and post-judgment interest; and

//

m) Granting any other relief as this Court may deem just and proper.

Respectfully Submitted,

DATED: November 17, 2023

**KRONENBERGER ROSENFELD LLP**

By:    /s Karl Kronenberger
        Karl Kronenberger

*Attorneys for Plaintiff and the Proposed Classes*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial of this action by jury of all issues that may be tried to the jury.

Respectfully Submitted,

DATED: November 17, 2023

**KRONENBERGER ROSENFELD LLP**

By: ___/s Karl Kronenberger___
Karl Kronenberger

*Attorneys for Plaintiff and the Proposed Classes*