United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LOGAN ALLEC,

                Plaintiff,

     v.

UPSIDE SERVICES, INC.,

                Defendant.

Case No.  23-cv-05982-SK

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITH PREJUDICE**

Regarding Docket No. 47

This matter comes before the Court upon consideration of the motion to dismiss by Defendant Upside Services, Inc.  Having carefully considered the parties' papers, relevant legal authority, and the record in the case, and having had the benefit of oral argument, the Court hereby GRANTS Defendant's motion WITH PREJUDICE for the reasons set forth below.

## BACKGROUND

Plaintiff Logan Allec is a certified public accountant and internet content creator who has acquired over 100,000 followers on his YouTube channel.  (Dkt. No. 44, Amended Complaint ("Amended Compl."), ¶ 5.)  Additionally, Plaintiff is the founder of a personal finance website (moneydoneright.com), which at its peak saw over 100,000 visitors per month.  (*Id*. at ¶ 6.)  Defendant is Upside Services, Inc. ("Upside"), which is a retail technology company that offers a gas rebate service through its website and its mobile app, which is available on Google Play and the Apple App Store.  (*Id*. at ¶¶ 2, 12.)  In or around April 2022, Upside was valued at 1.5 billion dollars.  (*Id*. at ¶¶ 12, 16, 111.)  And as of today, Upside boasts over 30 million users, and its transactions drive over 5 billion dollars annually in purchases of fuel.  (*Id*. at ¶ 15.)

Upside's service connects users to retailers of gas through its mobile app, also called Upside.  (*Id*. at ¶ 13.)  When a consumer uses the Upside app to purchase fuel at an merchant partnered with Upside, that consumer receives a cash rebate that reimburses the consumer for a portion of the fuel cost.  (*Id*. at ¶ 14.)  Upside has integrated with Uber, Lyft, Instacart, and many

other companies, and has earned the number two ranking in Deloitte's Fast 500 and the number 308 spot on the Inc. 5000 list in 2022.  (*Id*. at ¶ 17.)

Beginning in 2016, Upside started offering its rebate service for gas and a corresponding payment to its customers who make referrals.  (*Id*. at ¶ 2.)  Plaintiff alleges that, from its inception, Upside offered to its customers who made referrals continued referral payments for their lifetime. (*Id*. at ¶ 2.)  On July 18, 2018, Plaintiff states that he began making referrals for Upside.  (*Id*. at ¶ 7.)  Over the years, Plaintiff frequently promoted Upside on his YouTube channel and on his website.  (*Id*. at ¶ 8.)  Moreover, Plaintiff invested personal time and finances into creating content relating to Upside, including hiring third parties to assist with drafting and marketing.  (*Id*. at ¶¶ 9-10, 87-88.)  Plaintiff took this on in order to take advantage of the same referral bonus that Upside offered all its users but on a larger scale.  (*Id*. at ¶ 89.)  According to Plaintiff, his content eventually enticed "hundreds of thousands of viewers to learn about Upside's services," who ultimately used Plaintiff's referral link or code to sign up for Upside.  (*Id*. at ¶¶ 11, 91, 93.)  In 2021 alone, Plaintiff's Upside-related webpages had over 13,000 unique visitors; Plaintiff's March 2021 Upside-related video was viewed over 66,000 times.  (*Id*. at ¶¶ 11, 90, 92.)

Early on, to maximize its growth as a new company, Upside relied on grassroots efforts by users.  (*Id*. at ¶¶ 29, 34.)  To accomplish this, Upside offered to pay any user who successfully referred another user to the Upside platform.  (*Id*. at ¶ 30.)  Plaintiff alleges that acceptance of this offer was in the form of a user referring another user, and a user's acceptance of the offer by referring another user fulfilled the user's obligations under a contract.  (*Id*. at ¶ 30.)  In Plaintiff's view, this transaction obligated Upside "to pay the referring user a referral bonus for every gallon of gas the referred user pumped—for life."  (*Id*. at ¶ 30.)  In other words, every time the referred user used Upside services while purchasing gas, the referring user would receive a small payment, usually one to two cents.  (*Id*. at ¶¶ 31, 33.)

Upside advertised its business model as a "win-win-win" in advertisements, which Plaintiff alleges existed independently of any website Terms of Service ("Terms"):

> Once your referral becomes a[n Upside] user, you'll also get a bonus for every gallon of gas they buy in the future, and a bonus every time one of their referrals gets gas.  Forever!

United States District Court
Northern District of California

1
2

> We do this because more people using [Upside] means more cash
> back for you and more profit for merchants.  That's win-win.  So we
> want to encourage you to continue referring [Upside] to everyone you
> know.

3    (*Id*. at ¶ 32.)

4        In July 2018, Plaintiff responded to Upside's offer by starting to refer his following to

5    Upside, who used Plaintiff's referral code.  (*Id*. at ¶ 35.)  Plaintiff alleges that, as a result of each

6    act of performance by Plaintiff under this contract, Upside began paying Plaintiff for such

7    referrals, including every time one of the referrals paid for gas using Plaintiff's referral code.  (*Id*.

8    at ¶ 35.)

9        Upside would continue to aggressively advertise its referral program to its users.  (*Id*. at ¶

10   36.)  For example, whenever users, including Plaintiff, successfully made a referral, Upside

11   responded to individuals referring users with a variation of the screen below, confirming they

12   would receive bonuses for that referral, in perpetuity:

13
14
15
16
17
18
19
20
21
22
23
24



25   (*Id*. at ¶ 36.)[1]

26

27       ─────────────────

28       [1] The Court notes that in 2018, Upside was known as "GetUpside."  In this Order, the
Court will refer to Defendant as it is now known, "Upside," but, for ease of reading, the Court will
not alter "GetUpside" when in quoted material because the names are clearly related.

Upside also actively encouraged current users to purchase licensed cards, stickers, and static clings from its online store, which could be customized with a user's individual referral code. (*Id.* at ¶ 37.) Further, Upside urged users to broadly share their codes, including at gas stations, provided that the users first obtained permission from the gas station to do so. (*Id.* at ¶¶ 38, 40.) Upside also provided its users with specific instructions on how to share their referral codes "via email, social media apps (Facebook, Twitter, etc.), chat apps (WhatsApp), or any other app on [their] phone." (*Id.* at ¶ 39.) In other words, apart from the requirement that users obtain permission before leaving their referral codes at gas stations, Plaintiff alleges that there were no restrictions on Upside's referral program. (*Id.* at ¶ 40.)

Plaintiff asserts that he and other people saw Upside's program as an opportunity to earn money by leveraging their own websites, audiences, and social media followings. (*Id.* at ¶ 41.) In exchange, these users were promised a lifetime benefit of either $0.005 and $0.01 for each gallon of gas their referrals pumped via Upside. (*Id.* at ¶ 42.) Although each referral user only generated between $0.005 and $0.01 per gallon of gas pumped using the Upside app, by targeting a large volume of users with a specific interest in financial savings, Plaintiff was able to grow his referral network to the point that it generated a significant source of revenue. (*Id.* at ¶ 94.) Plaintiff alleges that countless users then undertook efforts to promote Upside across numerous platforms and refer users to Upside, thereby accepting Upside's purported unilateral contract offer. (*Id.* at ¶ 43.) Relatedly, numerous articles and videos emerged online praising the benefits of Upside and demonstrated that users invested their own time and resources marketing on Upside's behalf. (*Id.* at ¶ 44.) Content creators and website owners invested in driving traffic to their websites to capitalize on Upside referrals. (*Id.* at ¶ 45.) These actions included paying for content, creating videos, writings scripts, writing articles, paying for search engine optimization, purchasing Upside-licensed stickers, paying for ads, and so on. (*Id.* at ¶ 45.)

Plaintiff alleges that, for several years, Upside's business model operated successfully. (*Id.* at ¶ 46.) However, that success changed in the wake of the 2020 COVID-19 pandemic. (*Id.* at ¶ 47.) During the height of the pandemic, consumer demand for gasoline receded considerably. (*Id.* at ¶ 48.) With prices for gas declining, Upside began relying heavily on word of mouth and

engagement in the community to keep users excited about saving 15 to 25 cents per gallon.  (*Id.* at ¶ 48.)  In the fall of 2021, Plaintiff alleges that there was a surge in gas pricing and consumer demand, both of which came to exceed pre-pandemic levels.  (*Id.* at ¶ 49.)

With prices for bas rapidly approaching all-time highs, users were more motivated than ever to take advantage of opportunities to save money, such as with Upside.  (*Id.* at ¶¶ 3, 50.)  At this point, Plaintiff asserts that Upside's userbase had grown to the point that it no longer needed to rely on individual referrals to establish itself in the market.  (*Id.* at ¶ 51.)  At around this time, Plaintiff alleges that Upside no longer wanted to offer the same compensation for referrals because it could acquire users on its own.  (*Id.* at ¶ 52.)  But Upside had spent five years offering to issue payments "for life" for referrals.  (*Id.* at ¶ 53.)

According to Plaintiff, Upside decided to address this problem by modifying its Terms. (*Id.* at ¶ 54.)  Historically, Plaintiff alleges that Upside's Terms contained only a passing reference to its referral program that did not suggest that the Terms governed the referral program.  (*Id.* at ¶ 55.)  In Plaintiff's view, the referral program was not included in Upside's definition of its "services."  (*Id.* at ¶ 55.)

> **Services Description:**  The Service is designed to allow you to earn Cash Back rewards on purchases you make at gas stations, grocery store, restaurants and other participating establishments.  The Service is completely free for you to use; the Cash Back rewards are offered in exchange for your loyalty to our participating merchants, subject to the terms below.

(*Id.* at ¶ 55.)  Plaintiff states that any unilateral contracts arising from Upside's referral program existed independently of Upside's Terms because the Terms did not reference the referral program, specifically in the services description.  (*Id.* at ¶ 56.)  Plaintiff notes that payments to users who referred customers were also independent of any account that would have fallen under Upside's Terms as demonstrated by payments being made to users through external services such as PayPal.  (*Id.* at ¶ 56.)

On November 12, 2021, Plaintiff alleges that "Upside—for the very first time—attempted to incorporate its referral program into its Terms, and introduced a 'affiliate program:'"

**Referral and Affiliate Programs:** GetUpside offers you the opportunity to earn additional Cash Back rewards through its Referral Program, by recruiting friends and personal acquaintances to join GetUpside. You can earn a referral bonus when a new user creates a GetUpside account using your personal referral code and subsequently claims a GetUpside offer that we are able to validate. The Referral Program is only intended for referrals to friends and personal acquaintances. You are prohibited from (i) sharing your personal referral code on a website or blog, except as specified herein; (ii) purchasing advertisements featuring or promoting your personal referral code; (iii) posting your personal referral code at gas stations, restaurants, grocery stores, or other participating establishments; and (iv) otherwise disseminating or publishing your personal referral code for widespread public use. You may share your personal referral code through your own personal account(s) on social media, provided that you have fewer than 2500 followers.

Users who want to promote GetUpside beyond their friends and personal acquaintances are invited to apply to join GetUpside's Affiliate Program. You are not permitted to participate in both the Referral Program and Affiliate Program and/or claim referral bonuses through both Programs. GetUpside reserves the right in its sole discretion to change the terms of its Referral and Affiliate Programs at any time, including the amount and frequency of referral bonuses.

(*Id*. at ¶ 57.)

Plaintiff asserts that at no point before November 12, 2024, had Upside reserved the right to make changes to its referral program or the "amount and frequency of referral bonuses." (*Id*. at ¶ 58.) Likewise, at no time prior to November 12, 2024, had Upside restricted the use or dissemination of referral codes; rather, it had invited users to share these codes as broadly as possible both in-person and online. (*Id*. at ¶ 59.) The latest Terms stated that the changes became effective fourteen days after they were published, which was November 26, 2021. (*Id*. at ¶ 60.)

On November 18, 2021, Upside's head of operations, Kristen Bierman, communicated with Upside's users, including Plaintiff, with a targeted email that read:

> Good morning,
>
> We want to thank you for being a loyal GetUpside customer, and we would like to invite you to apply to our Affiliate Program.

You've demonstrated considerable success in recruiting new users on our standard Referral Program, and we congratulate you on that success. However, we've recently made some changes to our Terms of Service to clarify that our Referral Program is intended for family and personal acquaintances only – it is not for use on blogs or as part of other marketing behaviors. As such we will be discontinuing your referral code on December 1. This means that new users will no longer be able to use your code to sign up for GetUpside, and the network earning you've been receiving from past referrals will cease accruing as of November 30.

Instead, we strongly encourage you to join our Affiliate Program. This program is managed through the Commission Junction affiliate platform and managed by Fiat Growth. I have copied the team on this email so they can provide specific guidance on getting started.

Please let us know if you have any additional questions.

Best,

Kristen

(*Id.* at ¶ 61.) Thus, as of December 1, 2021, Upside stopped issuing any payments for previously made referrals if it, in its sole discretion, believed that these were not payments made to friends and family members. (*Id.* at ¶ 70.) Plaintiff alleges that this was true for all users, regardless of whether Upside contends that the users ever agreed to the new Terms. (*Id.* at ¶ 71.) Moreover, Plaintiff states that Upside stopped crediting users for newly made referral if it believed that these users should qualify instead for its affiliate program. (*Id.* at ¶ 72.) This belief was significant because emails from Upside had projected Plaintiff as potentially receiving $13,996.83 for December 2021 alone, and Plaintiff projects that he would have made $167,961.96 in the following year. (*Id.* at ¶¶ 95-96.)

According to Plaintiff, this was the first time Upside indicated to its users that it was not only planning to revamp the referral program going forward, but it "planned to use this change to its Terms of Service to justify retroactively modifying the compensation for referrals users had already made." (*Id.* at ¶ 62) (emphasis omitted). Thus, Upside now "clarifi[ed]" that it was never its intent that users share their referral codes with the public at large," and it had decided to stop paying its users according to the terms of the offer it had made to them for their referrals. (*Id.* at ¶¶ 63-65.) Meanwhile, Plaintiff alleges that Upside failed to make changes to relevant pages on its website to also clarify to users that it was no longer offering lifetime referral benefits. (*Id.* at ¶

66.)  This included that the website continued to describe the lifetime benefits on its support page and in several articles.  (*Id*. at ¶¶ 66-67.)  Plaintiff asserts that, until he filed his complaint in this action, Upside maintained its position that "it was okay to publish their referral codes publicly as long as they had permission from the establishment where the code was posted."  (*Id*. at ¶ 68.)  Additionally, Upside failed to publish any updates to its landing page where newly referred users would arrive, meaning that they were oblivious to this change.  (*Id*. at ¶ 69.)

Despite the November 18, 2021 email that stated that user referral codes from original users would be deactivated, Plaintiff alleges that those codes remained active, resulting in a continued benefit to Upside without compensation to the users who referred other people to Upside.  (*Id*. at ¶ 73.)  Additionally, Plaintiff states that new users received a bonus from signing up by using a referral code under the new Terms, but original users, whose codes were still being used, were no longer receiving payments and were not contacted regarding that Upside had not deactivated their referral codes and that Upside was benefiting from the original users' content.  (*Id*. at ¶¶ 74, 76.)  Upon information and belief, Plaintiff alleges that "most referring [users] were never informed by Upside about the[] purported changes to the referral program contract as indicated in its revied Terms (including because they never saw nor assented to the Terms)."  (*Id*. at ¶ 75.)

Up to this point, Plaintiff asserts that he had made an enormous number of referrals to Upside via his personal website and YouTube channel, which Plaintiff cites as having over 130,000 subscribers.  (*Id*. at ¶¶ 83-86.)  Plaintiff alleges that when he registered with Upside that there was no opt-out provision in Upside's Terms.  (*Id*. at ¶¶ 101-02.)  Thus, once Plaintiff received the November 18, 2021 email, Plaintiff alleges that he took immediate steps to protect his rights.  (*Id*. at ¶ 97.)  Plaintiff states that he "timely sent a written [arbitration] opt-out notice to Upside less than 30 days after the new Terms were promulgated."  (*Id*. at ¶ 99.)  However, Upside responded that Plaintiff's opt-out request was untimely because a separate 30-day opt out period had already run for Plaintiff following a prior update to its Terms that occurred in October 2021, which had included the arbitration clause.  (*Id*. at ¶¶ 100, 103.)  Plaintiff alleges that Upside introduced the October 2021 opt-out provision before notifying users that it was overhauling its

referral program in an attempt to thwart existing customers from successfully opting out of arbitration because they would only do so once they saw the referral program was being overhauled.  (*Id*. at ¶¶ 104-05, 114.)

Plaintiff alleges that to this day California users continue to be bombarded with advertisements about "lifetime" referral bonuses.  (*Id*. at ¶¶ 77-79, 116.)  Plaintiff asserts that "the public continues to receive false advertisements from Upside," and Upside continues to receive new users, which it knows "were referred to it under an offer that is no longer valid."  (*Id*. at ¶¶ 80, 82.)  Plaintiff states that new users do not encounter any "qualifications or disclaimers (or even Upside's Terms) when signing up for its services using the App:"



(*Id*. at ¶ 81.)

In May 2022, Upside informed Plaintiff it was terminating his account for a breach of its Terms.  (*Id*. at ¶ 106.)  Upside cited Plaintiff's continued use of his referral code on his previously published YouTube videos as the breach of its Terms.  (*Id*. at ¶ 107.)  Plaintiff alleges that Upside continues to allow individuals to sign up using Plaintiff's and other users' referral codes, giving Upside a benefit with no compensation to Plaintiff.  (*Id*. at ¶ 108-09.)  Plaintiff contends that Upside could end this problem with a pop-up disclaimer or that Upside could simply disable these

United States District Court
Northern District of California

1  codes.  (*Id.* at ¶ 110.)  Plaintiff believes that Upside has reneged on its promise and continues to

2  benefit and that Upside has deprived Plaintiff and others of funds to which they are entitled.  (*Id.*

3  at ¶¶ 112-13, 115.)

4          On November 17, 2023, Plaintiff filed his complaint, and all parties consented to the

5  jurisdiction of a federal magistrate judge.  (Dkt. No. 1, 8, 15.)  In January 2024, Upside filed a

6  motion to dismiss for failure to state a claim.  (Dkt. No. 16.)[2]  Following a hearing, the Court

7  granted Upside's motion.  (Dkt. No. 40.)  In particular, the Court observed that the complaint did

8  not clearly articulate the timing and terms of the contract Plaintiff believed he had entered with

9  Upside.  (*Id.* at 9.)  Significantly, in the hearing, Plaintiff had offered a seemingly novel theory

10  that he had entered into multiple unilateral contracts with Upside, which had not been pleaded in

11  the complaint.  (*See id.* at 10.)  The Court gave Plaintiff leave to amend, and on May 29, 2024,

12  Plaintiff filed an amended complaint.  (Dkt. No. 44.)  Plaintiff brings eight claims:  (1) violation of

13  California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; (2) violation of

14  California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*; (3) violation of the

15  California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*; (4) common law fraud;

16  (5) unjust enrichment; (6) breach of contract; (7) breach of covenant of good faith and fair dealing;

17  (8) conversion.  (Dkt. No. 44, pp. 21-31.)  Plaintiff also seeks to represent a class, including "[a]ll

18  persons in California, within the applicable statute of limitations, who made referrals to Upside

19  pursuant to its lifetime referral program."  (*Id.* at ¶ 118.)  For relief, Plaintiff prays for

20  compensatory, actual, statutory, punitive, and civil damages.  (*Id.* at p.32.)  Plaintiff also seeks

21  equitable relief and reasonable attorney's fees and costs.  (*Id.*)

22          On June 20, 2024, Upside filed the instant motion to dismiss (Dkt. No. 47), which has been

23  fully briefed (Dkt. Nos. 52, 57) and has sparked dueling entries on the docket over the issue of

24  incorporation by reference of Upside's Terms and other evidence.  (Dkt. Nos. 51, 55, 58, 59, 62,

25  63.)  On August 19, 2024, the Court held a hearing on the matter.  (Dkt. No. 66.)[3]

26

27          [2] Upside also moved to dismiss for *forum non conveniens* but withdrew that branch of its
   motion before the hearing.  (Dkt. No. 31.)

28          [3] Because Plaintiff brings this action as a putative class action, (Dkt. No. 44, ¶¶ 118-30),
   and he is the only named plaintiff of the class, his own claims must survive in order to represent

United States District Court
Northern District of California

**ANALYSIS**

**A.    Applicable Legal Standard on Motion to Dismiss.**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted.  On a motion to dismiss under Rule 12(b)(6), the Court construes the allegations in the complaint in the light most favorable to the non-moving party and takes as true all material allegations in the complaint.  *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986).  Even under the liberal pleading standard of Rule 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Rather, a plaintiff must instead allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).  If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile.  *See, e.g. Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Lieche, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

As a general rule, "a district court may not consider material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds, Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) (citation omitted).  However, documents subject to judicial notice, such as matters of public record, may be considered on a motion to dismiss.  *See Harris v. Cnty of Orange*, 682 F.3d 1126, 1132 (9th Cir.

---

the putative class.  *See Frank v. Gaos*, 586 U.S. 485, 492 (2019) (per curiam).  Therefore, at this pre-class certification stage, the Court will address only Plaintiff's individual claims regarding the motion to dismiss.

11

2011).  In doing so, the Court does not convert a motion to dismiss to one for summary judgment. *See Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991).  "The court need not . . . accept as true allegations that contradict matters properly subject to judicial notice . . . ." *Sprewell v. Golden State Warriors*, 266 F. 3d 979, 988 (9th Cir. 2001).

**B.      Screenshots Submitted with Reply**

        Plaintiff objects to consideration of evidence submitted with Upside's reply:  screenshots of Upside's registration process as well as screenshots of emails purportedly sent to all users of Upside regarding updates to the Terms. Upside responds that its new evidence is responsive to Plaintiff's arguments raised in his opposition and that Plaintiff has had an opportunity to respond. (Dkt. No. 63.)  (*Id.*)  The Court agrees with Upside that its rebuttal request for incorporation is responsive to Plaintiff's arguments regarding Upside's seeking to incorporate its Terms for merely a defense, Upside's declarant's qualifications, and the authenticity of certain evidence. Significantly, the Court notes that Plaintiff's opposition also takes the position that Upside has not yet proved that Plaintiff assented to the Terms; thus, the screenshots of the registration process (one such screenshot is even in the First Amended Complaint) appear to be especially relevant. The Court also notes that Upside filed its rebuttal request over three weeks before the hearing on the motion to dismiss and that, based on Plaintiff's own First Amended Complaint, Upside does not have sole possession of the evidence (*i.e.*, screenshots of the registration process).  The Court allowed Plaintiff to object and now overrules those objections.  While the Civil Local Rules do place limitations on new evidence submitted in reply, the Court finds that Plaintiff has had an opportunity to respond at the hearing.  Therefore, the Court, in its discretion, will consider whether to incorporate this evidence into the First Amended Complaint.  *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, (9th Cir. 2024) ("A district court does not abuse its discretion in considering new arguments or evidence if the opposing party had an opportunity to respond.").  For separate reasons discussed below, the Court will not incorporate the screenshots of the emails.

**C.      Upside's Motion for Incorporation**

United States District Court
Northern District of California

1   Upside moves to incorporate its Terms, certain screenshots of emails, and certain

2   screenshots within the Upside app.  (Dkt. Nos. 47, 56.)  The Court previously incorporated

3   Upside's Terms into the original complaint in ruling on Upside's first motion to dismiss.  (Dkt.

4   No. 36, 4-7.)  Plaintiff now objects to incorporation of the Terms and also requests that the Court

5   not consider any evidence submitted by Upside accompanying its reply.  (Dkt. No. 59.)

6   Objections to Incorporation of Terms

7   First, Plaintiff argues that the basis of the Court's determination to incorporate is no longer

8   relevant because Plaintiff's claims in his First Amended Complaint now solely rely on alleged

9   unilateral contracts that are not subject to Upside's Terms.  (Dkt. No. 51.)  In addition, Plaintiff

10  argues that Upside seeks to incorporate its Terms only for establishing a defense, which is not

11  permissible as discussed in *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1002 (9th Cir.

12  2018).  (*Id*. at 4.)  Finally, Plaintiff questions the authenticity of the screenshots provided by

13  Upside, which Plaintiff argues renders incorporation impermissible, as discussed in *Knieval v.

14  ESPN,* 393 F.3d 1068, 1076 (9th Cir. 2005).  (Dkt. 62, 5-7.)

15  Upside replies that, notwithstanding Plaintiff's new legal theory, he nonetheless cites to

16  Upsides' Terms no less than 41 times, including to demonstrate Upside's purportedly unfair

17  conduct.  (Dkt. No. 63, 2.)  Upside also argues that Plaintiff's suggestion of the authenticity of

18  included screenshots is unfounded and that the screenshots are provided in response to Plaintiff's

19  partial inclusions of screenshots in the First Amended Complaint.  (*Id*. at 2-3.)  The Court

20  GRANTS the motion to incorporate into the First Amended Complaint the Terms and the

21  screenshots of Upside's "three-step sign up process" (Dkt. No. 47-2, Ex. 1; Dkt. No. 58, Exs. 1, 7),

22  but DENIES the motion with respect to the other evidence of emails that Upside purportedly sent

23  to Plaintiff.  (Dkt. No. 58, Exs. 2-7.)

24  "[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents

25  as though they are part of the complaint itself."  *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d

26  988, 1002 (9th Cir. 2018).  "The doctrine prevents plaintiffs from selecting only portions of

27  documents that support their claims, while omitting portions of those very documents that

28  weaken—or doom—their claims."  *Id*.  A district court may "consider documents in situations

United States District Court
Northern District of California

1    where the complaint necessarily relies upon a document or the contents of the document are

2    alleged in a complaint, the document's authenticity is not in question and there are no disputed

3    issues as to the document's relevance." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th

4    Cir. 2010).  The Ninth Circuit has explained that, in deciding whether to incorporate a document

5    by reference, a court must review the complaint to determine whether it "refers extensively to the

6    document or the document forms the basis of the plaintiff's claim." *Id*., quoting *United States v.*

7    *Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  While eschewing a bright line rule on how

8    "extensively" a complaint must refer to a document for incorporation, the Ninth Circuit has held

9    that "the mere mention of the existence of a document is insufficient to incorporate the contents of

10    a document." *Coto Settlement*, 593 F.3d at 1038.  In addition, a court "may assume [an

11    incorporated document's] contents are true for purposes of a motion to dismiss under Rule

12    12(b)(6)." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  However, "it is improper to

13    assume the truth of an incorporated document if such assumptions only serve to dispute facts

14    stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003.

15          Here, Plaintiff referenced the Terms no less than forty-one times in the First Amended

16    Complaint (*see* Dkt. No. 47-1, 4-10.)  Thus, the Court finds the First Amended Complaint

17    extensively refers to the Terms.  Moreover, Plaintiff does not otherwise seriously question the

18    authenticity of the Terms.  For this reason, incorporation by reference of the Terms is appropriate.

19    While Plaintiff attempts to frame his First Amended Complaint as merely referencing the Terms

20    as a foil to his own alleged unilateral contract claims, Plaintiff does not contend with Ninth Circuit

21    precedent that allows for incorporation where a complaint simply "refers extensively to the

22    document." *Coto Settlement*, 593 F.3d at 1038.  Moreover, it appears that Plaintiff highlights

23    certain aspect of Upside's Terms to support his claims (by purportedly distinguishing his claims

24    from Upside's Terms and/or suggesting questionable tactics by Upside) while at the same time

25    omitting the entire set of Terms, which is what "[t]he doctrine prevents plaintiffs from [doing]."

26    *Khoja*, 899 F.3d at 1002.  Therefore, the Court finds Plaintiff's reliance on *Khoja* misplaced.

27          The Court also agrees with Upside that screenshots of its three-step signup processes

28    should be incorporated into First Amended Complaint.  (Dtk. No. 58, Exs. 1, 7.)  As Plaintiff

himself notes in his opposition, "Plaintiff even provides a screenshot from Defendant's app showing how there is no reference to any Terms on the Upside signup page on the App." (Dkt. No. 62, 7, citing Dkt. No. 44, ¶ 81.)  Specifically, Paragraph 81 of the First Amended Complaint states:  "In fact, users do not encounter any qualification or disclaimers (or even Upside's Terms) when signing up for its services using the App." (Dkt. No. 44, ¶ 81.)  Thereafter, Plaintiff includes a screenshot ostensibly from the Upside app with no mention of any Terms. Accordingly, Plaintiff's First Amended Complaint necessarily relies on the signup screens for Upside.  Plaintiff has put this at issue and Upside has brought to the Court's attention the entire three-step process that was in effect at the time Plaintiff would have registered, as opposed to a cherry-picked screenshot from Plaintiff.  Therefore, the Court incorporates the screenshots that relate to Upside's three-step registration process. (Dtk. No. 58, Ex. 1.)  The 2018 version appears below:



(*Id*. at Ex. 1.)

Although Plaintiff challenges the authenticity, this is misplaced.  Upside's request for incorporation by reference includes "true and correct screenshot[s]" of the three-step sign up process that Upside users encountered in 2018, when Plaintiff signed up for Upside, and the sign-

United States District Court
Northern District of California

United States District Court
Northern District of California

up process users see today.  (Dkt. No. 58, ¶¶ 1-2.)  Declarant Jan Rubio, a co-founder of Upside, has worked at Upside since February 2016 and currently works as its Principal Product Designer.  (*Id.* at ¶¶ 1-2.)  Rubio attests to the fact that these screenshots show an accurate depiction of what any user would have encountered upon signing up for Upside during each specific period.  (*Id.* at ¶¶ 3-9.)  Before his current role at Upside, Rubio served as a senior software engineer.  (*Id.* at ¶ 2.)  Part of Rubio's responsibility in that role was to update the Terms and Privacy Policy on Upside's website.  (*Id.*)  Rubio further attests to the fact that he "maintains the archive containing current and historical screenshots of Upside's mobile application designs" and is "familiar with emails periodically sent to users notifying them of changes to the Terms of Service and Privacy Policy."  (*Id.* ¶ 2.)  Plaintiff's only response is that these are mockups; Plaintiff's citation to *Knieval* is merely for a broader proposition of law restated in *Coto Settlement* and *Khoja*.  Thus, the Court finds that Upside has authenticated the screenshots of the registration process.  Further, the Court additionally finds that Plaintiff has placed Upside's sign-in process at issue and has referred to it extensively in the First Amended Complaint by including a screenshot.  Therefore, the Court incorporates the screenshots of the sign-in process on this basis as well.[4]  *See Coto Settlement*, 593 F.3d at 1038.

In contrast, the Court does not find that incorporation by reference into the First Amended Complaint is appropriate for the screenshots of emails (Dkt. No. 58, Exs, 2-6.)  Plaintiff argues that Upside attempts to use the screenshots of the emails to demonstrate that Plaintiff was subject to the Terms and also received notice when they were changed.  (*Id.*)  The Court notes that the screenshot of emails provided by Upside indicate that they were emails sent to "users@getupside.com."  It is not obvious from these screenshots that this email was sent to all users of Upside, including Plaintiff.  While this evidence might be sufficient were this summary judgment, it is not sufficient for incorporation for a motion to dismiss.  Accordingly, the Court

---

[4] The Court incorporates the current screens for the sign-up process (Dkt. No. 58, Ex. 7) because Upside points out that Plaintiff's First Amended Complaint includes one screenshot from the current sign in process.  (Dkt. No. 44, ¶ 81.)  The Court's primary motive for this incorporation is to distinguish between what Plaintiff provided in the First Amended Complaint and the actual sign-in process when he registered for Upside.

1    DENIES the motion to incorporate the screenshots of emails into the First Amended Complaint.

2    (Dkt. No. 58, Exs, 2-6.)

3    **D.    Upside's Motion to Dismiss.**

4         Upside first argues that its Terms are enforceable against Plaintiff and that a motion to

5    dismiss is the proper vehicle to consider whether Plaintiff's alleged theory of a unilateral contract

6    is subject to its Terms.  (Dkt. No. 47, 6-11.)  Upside then argues that its Terms bar Plaintiff's

7    contract claims because of a one-year limitations clause.  (*Id*. at 12-17.)  With this claim as a lead

8    example, Upside argues that all of Plaintiff's other claims are subject to the one-year limitations

9    clause as well.  (*Id*. at 18-19.)  In the alternative, Upside argues that Plaintiff's non-contractual

10   claims fail to otherwise state a claim.  (*Id*. at 19-25.)  Plaintiff responds that he never consented to

11   Upside's Terms and that the Terms are otherwise unenforceable for a variety of reasons.  (Dkt.

12   No. 65, 6-20.)  Plaintiff then explains how his non-contractual claims each state a claim.  (*Id*. at

13   20-25.)  Finally, Plaintiff asks the Court for leave to amend should the motion to dismiss be

14   granted.  (*Id*. at 25.)

15        **1.  Upside's Terms of Service Apply to Plaintiff**

16        While the Court has incorporated Upside's Terms into the First Amended Complaint, it

17   must now determine whether they are applicable to Plaintiff's claims.  Plaintiff begins by arguing

18   that he had neither actual nor constructive notice of Upside's Terms when he signed up.

19   Relatedly, Plaintiff argues that no was no mutual assent to Upside's Terms, that a contract

20   comprised of Upside's Terms would have been illusory, that the Terms are unconscionable, and

21   that, even if the Terms do apply, they do not cover the disputed unilateral contracts at issue.

22   Upside responds that Plaintiff had actual or at the very least constructive notice of Upside's

23   Terms.  Upside then addresses Plaintiff's arguments regarding enforceability.  The Court agrees

24   with Upside that at the very least, Plaintiff had constructive notice of Upside's Terms when he

25   registered in 2018.  Additionally, Plaintiff's attempts to argue that the Terms lack enforceability

26   are unavailing.

27        As the Ninth Circuit has observed, "[r]easonably conspicuous notice of the existence of

28   contract terms and unambiguous manifestation of assent to those terms by consumers are essential

17

if electronic bargaining is to have integrity and credibility." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  "To avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements . . . have devised rules to determine whether meaningful assent has been given."  *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 476 (9th Cir. 2024), quoting *Berman*, 30 F.4th at 856.  "Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  *Id.*, quoting *Berman*, 30 F.4th at 856.

As relevant here, a "browsewrap agreement" is where "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website."  *Berman*, 30 F.4th at 856.  "To be conspicuous, a browsewrap agreement 'must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'"  *Patrick*, 93 F.4th at 477, quoting *Berman*, 30 F.4th at 856.

The Court finds that Upside's 2018 browsewrap agreement was reasonably conspicuous.



18

(Dkt. No. 56, Ex. 1.)  The language on the screen clearly states that, by pressing "Continue," a user agrees to Upside's Privacy Policy and its Terms.  In addition, the font size is only marginally smaller than that of the other text on the screen, and the layout does not appear to be cluttered.  Finally, both "Privacy Policy" and "Terms of Service" are capitalized and in blue text, which a reasonable internet user would interpret as a hyperlink.  *See Berman*, 30 F.4th at 857.

Second, Plaintiff alleges in the First Amended Complaint that he "registered with Upside" (Dkt. No. 44, ¶ 101), which, as demonstrated above, required clicking the "Continue" button.  Thus, the Court finds that Plaintiff unambiguously manifested his assent to Upside's Terms.  *See Patrick*, 93, F4th at 477.  Accordingly, the Court concludes that Upside's Terms applied to Plaintiff from the time he registered with Upside.[5]

### 2.  Upside's Terms of Service

Having concluded that Plaintiff and his claims are subject to Upside's Terms, the Court now quotes the relevant provisions from the 2017 Terms in effect when Plaintiff registered:

> **Welcome to GetUpside!**
>
> Upside Services, Inc. ("GetUpside," "we," "us," "our") provides its services (described below) to you through its websites located at www.getupside.com and www.upsideservices.com (the "Site") and through its mobile applications and related services (collectively, such services, including any new features and applications, and the Site, the "Service(s)"), subject to the following Terms of Service (as amended from time to time, the "Terms of Service").  We reserve the right, at our sole discretion, to change or modify portions of these Terms of Service at any time.  If we do this, we will post the changes on this page and will indicate at the top of this page the date these terms were last revised.  We will also notify you, either through the Services user interface, in an email notification or through other reasonable means.  Any such changes will become effective no earlier than fourteen (14) days after they are posted, except that changes addressing new functions of the Services or changes made for legal reasons will be effective immediately.  Your continued use of the Service after the date any such changes become effective constitutes your acceptance of the new Terms of Service.

---

[5] The Court also agrees with Upside that the First Amended Complaint contains allegations that Plaintiff at the very least received notice of Upside's updated Terms in a November 2021 email (Dkt. No. 44, ¶ 97) and likely also received notice of updated Terms in October 2021 (*See id.* at ¶ 103.)  However, the relevant inquiry before the Court is whether Upside's Terms applied to Plaintiff from the time of his registration.

United States District Court
Northern District of California

(Dkt. No. 47-2 ("2017 TOS"), p. 5.)[6]

> **Services Description:**  The Service is designed to allow you to earn Cash Back and GetUpside Credits on purchases you make at gas stations, grocery stores, restaurants and other establishments.

(*Id.*)

> **Violation of Terms:**  If we determine in our sole discretion that you have violated the Terms, we may in our sole discretion and as permitted by law, terminate your account and any pending, current, or future Cash Back Credits and GetUpside Credits balance you may have immediately expires. We will notify you of such termination at the email address associated with your account, and such termination shall be effective immediately.

(*Id.* at p. 7.)

> **Commercial Use:**  The Service is for your personal use.  Unless otherwise expressly authorized herein or in the Service, you agree not to display, distribute, license, perform, publish, reproduce, duplicate, copy, create derivative works from, modify, sell, resell, exploit, transfer or upload for any commercial purposes, any portion of the Service, use of the Service, or access to the Service.

(*Id.* at p. 8.)

> **Termination**
>
> You agree that GetUpside, in its sole discretion, may suspend or terminate your account (or any part thereof) or use of the Service and remove and discard any content within the Service, for any reason, including, without limitation, for lack of use or if GetUpside believes that you have violated or acted inconsistently with the letter or spirit of these Terms of Service.  . . . GetUpside may also in its sole discretion and at any time discontinue providing the Service, or any part thereof, with or without notice.  You agree that any termination of your access to the Service under any provision of this Terms of Service may be effected without prior notice, and acknowledge and agree that GetUpside may immediately deactivate or delete your account and all related information and files in your account and/or bar any further access to such files or the Service.  Further, you agree that GetUpside will not be liable to you or any third party for any termination of your access to the Service.

(*Id.* at p. 14.)

> **General**

---

[6] Docket Number 47-2 contains all versions of Upside's Terms from 2017 to the present.  Each version contains its own pagination.  Therefore, the Court will cite to the ECF page number of Docket Number 47-2 when referring to Upside's Terms.

United States District Court
Northern District of California

> These Terms of Service constitute the entire agreement between you and GetUpside and govern your use of the Service, superseding any prior agreements between you and GetUpside with respect to the Service. . . . You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of the Service or these Terms of Service must be filed within one (1) year after such claim or cause of action arose or be forever barred. A printed version of this agreement and of any notice given in electronic form will be admissible in judicial or administrative proceedings based upon or relating to this agreement to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form. . . . Notices to you may be made via either email or regular mail. The Service may also provide notices to you of changes to these Terms of Service or other matters by displaying notices or links to notices generally on the Service.

(*Id.* at pp. 14-15.)

### 3. The Terms of Service Are Enforceable, Including the One-Year Limitations Clause Applies to Plaintiff's Claims

With the relevant Terms in mind, the Court now considers whether the Terms, including the clause providing for a one-year limitation for initiating an action, are enforceable. Plaintiff argues that the Upside's Terms are not enforceable for a variety of reasons: 1) any assent to Terms was procured by misrepresentation, which frustrated the purpose of the lifetime referral program; 2) the Terms are an illusory agreement; 3) the Terms are unconscionable; and 4) ambiguities in the Terms do now allow for Upside to limit its liability. (Dkt. No. 62, 10-20.) Upside responds, in turn, discussing each of Plaintiff's arguments and arguing that none hold merit. (Dkt. No. 57, 6-12.) The Court agrees with Upside.

#### a. Misrepresentation and Frustration

Plaintiff argues that Upside misrepresented its program for cashback for life in its advertising as compared to the reality of Upside's Terms. (Dkt. No. 67, 10-11.) Thus, Plaintiff argues that any contract between Plaintiff and Upside was procured by misrepresentation. (*Id.*) Upside responds that its cashback for life program is consistent with its Terms and that users remain eligible to earn referral bonuses indefinitely so long as they comply with the Terms. (Dkt. No. 57, 7.) In other words, there was no misrepresentation. The Court agrees with Upside.

In support of his position, Plaintiff cites that "[i]f a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent

21

1    by one who neither knows nor has reasonable opportunity to know of the character or essential

2    terms of the proposed contract, his conduct is not effective as a manifestation of assent."

3    *Operating Eng'rs Pension Tr. v. Giorgi*, 788 F.2d 620, 624 (9th Cir. 1986), quoting Restatement

4    (Second) of Contracts § 163 (1979) (Kozinski, J., concurring).  However, that concurrence directly

5    quotes the Second Restatement of Contracts without any connection to whether the California

6    courts have adopted such a formulation of misrepresentation.  In other words, this citation is

7    unhelpful.

8        While there generally appears to be an inexact use of the term misrepresentation, the Court

9    observes that California has recognized 'misrepresentations' in contract law within a claim of

10   fraud.  *Robinson Helicopter Co., Inc. v. Dana Corp*., 34 Cal. 4th 979, 990, 102 P.3d 268, 274

11   (2004).  Specifically, "[t]he elements of fraud are: (1) a misrepresentation (false representation,

12   concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to

13   induce reliance; (4) justifiable reliance; and (5) resulting damage."  *Id*.  Further, California has

14   codified definitions of both intentional misrepresentation ("The suggestion, as a fact, of that which

15   is not true, by one who does not believe it to be true") and negligent misrepresentation ("The

16   positive assertion, in a manner not warranted by the information of the person making it, of that

17   which is not true, though he believes it to be true").  Cal. Civ. Code §§ 1572(1); 1572(2).[7]

18       Despite this detour on misrepresentation in California law, the Court takes Plaintiff's

19   position to be that he could not have assented to Upside's Terms because of an alleged

20   misrepresentation—in other words, an error in contract formation.  Plaintiff cites no California

21   authority for this position.  Instead, Plaintiff's authority states that "parties must manifest their

22   mutual assent to the terms of the agreement" and that "[t]hese elemental principles of contract

23   formation apply with equal force to contracts formed online."  *Brooks v. IT works Mktg., Inc*., No.

24   21-cv-01341-DAD (BAK), 2022 WL 2079747, at *4 (E.D. Cal. June 9, 2022), citing *Berman*, 30

25   F.4th at 855-56.  However, as analyzed above, the Court has concluded that Plaintiff manifested

26

27       [7] Moreover, the California Court of Appeal has recognized a misrepresentation of law
     cause of action that requires that the parties occupy a confidential relationship where one party has
28   superior knowledge to gain an unconscionable advantage.  *Bank of Am. v. Sanchez*, 3 C.A.2d 238,
     242, 38 P.2d 787 (Cal. Ct. App. 1934).

1    his assent to Upside's Terms when he registered for an account.  Therefore, this authority is also

2    unhelpful for Plaintiff.

3            Notwithstanding Plaintiff's hollow authority, the Court nonetheless concludes that Upside

4    did not misrepresent its Terms to Plaintiff.  Plaintiff alleges that he viewed the advertisement for

5    Upside's cashback for life referral program.  (*See, e.g.*, Dkt. No. 44, ¶ 36.)  Plaintiff then

6    registered with Upside (*Id.* at ¶ 101), which the Court has concluded necessarily means that

7    Plaintiff accepted Upside's Terms.  Part of Upside's Terms included, from at least 2017 onward,

8    provisions that Upside could alter the Terms and terminate a user's account if the user violated its

9    Terms.  (Dkt. No. 47-2, p. 3 "Violation of Terms.")  Thus, Plaintiff cannot rely on any alleged

10   misrepresentation in advertising because he was aware of (or at least agreed to) Upside's Terms

11   after viewing the advertisements and when he registered for Upside.  Moreover, as Upside notes,

12   the cashback for life program is consistent with its Terms in that users remain eligible to earn

13   referral bonuses indefinitely so long as they comply with the Terms.  This same logic dispenses

14   with Plaintiff's footnote argument regarding "net impression."  (Dkt. No. 62, 11 n.4.)

15           Upside has noted that Plaintiff mentions that the Terms "frustrate" the purpose of Upside's

16   lifetime referral program.  (Dkt. No. 62, 10-11.)  While Plaintiff does not make a specific

17   argument regarding the frustration of purpose doctrine, the Court concludes that the doctrine is

18   inapplicable.  Under California law, the elements of frustration are:  (1) the basic purpose of the

19   contract, which has been destroyed by the supervening event, was recognized by both parties to

20   the contract, (2) the event was of a nature not reasonably to have been foreseen, and the frustration

21   must be so severe that it is not fairly to be regarded as within the risks that were assumed under

22   the contract; and (3) the value of counterperformance to the promisor seeking to be excused was

23   substantially or totally destroyed.  *Peoplesoft U.S.A., Inc. v. Softeck, Inc.*, 227 F. Supp. 2d 1116,

24   1119-20 (N.D. Cal. 2002) (collecting cases).  In addition, "when a risk has been contemplated and

25   voluntarily assumed[,] . . . foreseeability is not an issue and the parties will be held to the bargain

26   they made."  *Id.* at 1120 (cleaned up).  To begin with, Upside's purpose in entering into the

27   Terms—to govern the parties' conduct and liabilities in their relationship—has not been frustrated.

28   Further, the Terms Plaintiff assented to when he registered his account stated Upside could (a)

United States District Court
Northern District of California

change its offerings at any time and (b) terminate its relationship with users who violated the TOS; thus, any purported frustration of purpose was entirely foreseeable.  Finally, Plaintiff advances no argument demonstrating the value of Upside's counterperformance was substantially or totally destroyed: Upside offered Plaintiff the opportunity to continue earning cashback bonus referrals through its affiliate program, but Plaintiff seemingly declined.  Therefore, the Court rejects any frustration of purpose argument.

### b.  Illusory Agreement

Plaintiff argues that, in his view, the unilateral contracts that existed between him and Upside were separate from the Terms and had accrued, meaning that Upside's later decision to amend its Terms to clarify its referral program and create an affiliate program rendered its 2017 Terms illusory.  Upside responds that California law is clear that terms that allow for unilateral modification are generally upheld and that any illusory argument is not otherwise applicable here. Upside is correct.

Under California law, "[t]erms allowing service providers to discontinue service, or remove content unilaterally . . . are routinely found in standardized agreements and enforced by courts."  *Murphy v. Twitter, Inc*., 60 Cal. App. 5th 12, 36 (2021) (cleaned up); *see Aggarwal v. Coinbase, Inc*., 2023 WL 4935003, at *5 (N.D. Cal. Aug. 2, 2023) (concluding unilateral amendment provision did not render terms of service illusory or in bad faith).  However,

> a provision allowing unilateral modifications by one party that is silent on whether it applies to accrued claims should be read—in keeping covenant of good faith and fair dealing—to apply only to unaccrued claims.  So construed, the contract is not illusory even though it includes the unilateral modification provision.  If, on the other hand, the agreement expressly allows modifications to the agreement to apply to accrued claims, "the covenant [of good faith and fair dealing] cannot vary the plain language, and the agreement is illusory."

*DDC Logistics, Inc. v. Airways Freight Corp., Inc*., No. 8:16-CV0-0903-JLS (KES), 2016 WL 10829513, at *3 (C.D. Cal. Sept. 7, 2016), citing *Peleg v. Neiman Marcus Group, Inc*., 204 Cal. App. 4th 1425, 1465-66 (2012).

Here, Plaintiff's argument for an illusory contract is unavailing.  As Upside has pointed

out, Plaintiff has not alleged that Upside changed its Terms after Plaintiff's dispute arose (*i.e.* accrual), nor are there allegations that Upside specifically targeted Plaintiff when it amended its Terms.  Thus, Upside's provision that allows it to amend its Terms unilaterally did not render the Terms illusory.

### c. Unconscionability

Plaintiff argues that three provisions in Upside's Terms render the Terms unenforceable as unconscionable.  Specifically, Plaintiff takes aim at the provision for limited liability, the provision for the one-year statute of limitations, and the provision allowing Upside the unilateral ability to amend or modify its Terms.  Upside responds first by acknowledging that its Terms are of a type of agreement that has been known to have some minimal amount of procedural unconscionability.  That said, Upside argues that Plaintiff is unable to demonstrate that Upside's Terms rise to a level of substantive unconscionability to render the Terms unenforceable.  Upside is correct.

Under California law, a court may refuse to enforce a provision of a contract if it finds that the provision was "unconscionable at the time it was made."  Cal. Civil Code § 1670.5(a). "Courts may find a contract as a whole 'or any clause of the contract' to be unconscionable." *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1023 (9th Cir. 2016), quoting Cal. Civil Code § 1670.5(a).  "The party asserting that a contractual provision is unconscionable bears the burden of proof."  *Id.*, citing *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 911, 353 P.3d 741 (2015).  Unconscionability has "both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results."  *Sanchez*, 61 Cal. 4th at 910 (internal quotation marks omitted).  "Both procedural and substantive unconscionability must be present in order for a clause to be unconscionable, but they need not necessarily be present to the same degree."  *Tompkins*, 840 F.3d at 1023, citing *Armendariz v. Found. Health Psychcare Services*, 24 Cal. 4th 83, 114, 6 P.3d 669 (2000). Although California courts have characterized "substantive unconscionability" in various ways, "[a]ll of these formulations point to the central idea that unconscionability doctrine is concerned not with a simple old-fashioned bad bargain but with terms that are unreasonably favorable to the

1    more powerful party." *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145, 311 P.3d 184

2    (2013) (internal quotations omitted).

3          "An evaluation of unconscionability is highly dependent on context." *Sanchez*, 61 Cal.4th

4    at 911.  California courts give the parties "a reasonable opportunity to present evidence as to [the

5    provision's] commercial setting, purpose, and effect," Cal. Civil Code § 1670.5, and then examine

6    the context in which the contract was formed and the "respective circumstances of the parties" as

7    they existed at the formation of the agreement.  *Nagrampa v. Mailcoups, Inc*., 469 F.3d 1257,

8    1288 (9th Cir. 2006) (en banc), quoting *Bolter v. Super. Ct*., 87 Cal.App.4th 900, 909, 104

9    Cal.Rptr.2d 888 (Cal. Ct. App. 2001).

10          Given that this is a motion to dismiss, and therefore the Court must view the alleged facts

11    in the light most favorable for Plaintiff, the Court will assume for purposes of this motion that

12    Upside's Terms create some minimal procedural unconscionability.  *See Murphy v. Twitter, Inc*.,

13    60 Cal. App. 5th 12, 37-38, 274 Cal. Rptr. 3d 360 (Cal. Ct. App. 2021).

14          Even assuming a minimal procedural unconscionability in Upside's Terms, Plaintiff

15    nonetheless fails to demonstrate substantive unconscionability.  Beginning with the limited

16    liability provision, "[i]n general, limitation of liability clauses are permissible."  *New England*

17    *Country Foods, LLC v. Vanlaw Food Prod., Inc*., 87 F.4th 1016, 1019 (9th Cir. 2023).  Moreover,

18    the California Court of Appeal has recognized that "service providers that offer free services to

19    Internet users may have a legitimate commercial need to limit their liability and have rejected

20    claims that such limitations are so one-sided as to be substantively unconscionable."  *Murphy*, 60

21    Cal. App. 5th at 36.  Upside, as Plaintiff acknowledges, is a "free" service provider to internet

22    users.  (Dkt. No. 44, ¶ 55.)  In addition, Upside was not legally obligated to offer Plaintiff the

23    opportunity to earn personal referral bonuses, and Plaintiff does not allege any harm, other than

24    from his loss of use of Upside's program.  Thus, Plaintiff's authority on the limited liability

25    provision is inapposite.  *See In re Yahoo! Inc. Customer Data Sec. Breach Litig*., 313 F. Supp. 3d

26    1113, 1137-38 (N.D. Cal. 2018).[8]  Plaintiff has not demonstrated that the limited liability

27    _____

28          [8] The Court agrees with Upside that Plaintiff's attempt to argue that the California Legal
      Remedies Act ("CLRA") applies to his case is misplaced.  In order for that statute to be

United States District Court
Northern District of California

United States District Court
Northern District of California

1  provision is unconscionable.

2  Turning to the one-year statute of limitations provision, Plaintiff fails to contend with the

3  fact that "California courts 'have afforded contracting parties considerable freedom to modify the

4  length of a statute of limitations.'" *Tompkins*, 840 F.3d at 1032, quoting *Moreno v. Sanchez*, 106

5  Cal. App. 4th 1415, 131 Cal. Rptr. 2d 684 (Cal. Ct. App. 2003). Further, and as was the case in

6  *Tompkins*, the one-year statute of limitations provision in Upside's Terms applies to both Plaintiff

7  and Upside. (Dkt. No. 47-2, 2017 TOS, pp. 14-15.) Plaintiff's authority, *Leon v. Family Fitness*

8  *Center (No. 107), Inc.*, is inapt because that case involved an exculpatory clause (*i.e.* a clause

9  disclaiming <u>all</u> liability) not a shortening of a statute of limitations provision. *Compare Leon*, 61

10  Cal. App. 4th 1227, 1232 (1998) *with Brisbane Lodging, L.P. v. Webcor Builders, Inc.*, 216 Cal.

11  App. 4th 1249, 1262, 157 Cal. Rptr. 3d 467 (Cal. App. Ct. 2013). Therefore, Plaintiff has not

12  demonstrated that the one-year statute of limitations provision that applies to both parties is

13  unconscionable.

14  Finally, Plaintiff again fails to contend with California law on the argument he raises with

15  respect to the provision that allows unilateral amendment or modification of the Terms. California

16  courts have recognized that "[t]erms allowing service providers to discontinue service, or remove

17  content unilaterally, . . . are routinely found in standardized agreements and enforced by courts."

18  *Murphy*, 60 Cal. App. 5th at 36 (internal quotation omitted). "Unless there is some evidence of

19  'egregious' tactics, . . . the party seeking to avoid the contract will have to show that the terms are

20  so extreme as to appear unconscionable according to the mores and business practices of the time

21  and place." *Id*. Plaintiff has not identified how Upside's Terms are egregious, especially in light

22  of the fact that "[internet] adhesion contract[s] . . . are 'indispensable facts of modern life that are

23  generally enforced.'" *Id*. at 37, quoting *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1244

24  (2016). Plaintiff's cited authority is distinguishable because the terms of service at issue in that

25

26  _____

27  implicated, Plaintiff must be a consumer as defined under the Act, "an individual who seeks or
   acquires, by purchase or lease, any goods or services for personal, family, or household purposes."
   Cal. Civ. Code § 1761(d). Plaintiff has not alleged that he purchased or leased any good or service

28  from Upside. Thus, the CLRA's consumer anti-waiver provision is not applicable here. The
   Court will not address the CLRA further in this section.

United States District Court
Northern District of California

1    case imposed one-sided remedies, including retention of funds paid by the plaintiff that could only

2    be recovered through a costly arbitration process.  *See Bragg v. Linden Research Inc*., 487 F.

3    Supp. 2d 593, 595-96 (E.D. Pa. 2007) (applying California law).  Accordingly, Plaintiff has not

4    demonstrated that Upside's provision that allows unilateral amendment or modification is

5    unconscionable.

6              **d.  Ambiguity**

7              Plaintiff also argues that Upside's Terms are ambiguous as to advertising claims.

8    Essentially, Plaintiff argues that Upside's one-year statute of limitations provision is ambiguous in

9    relation to Upside's arbitration provision.  The Court rejects these arguments.

10             If a contractual provision is "capable of two or more constructions, both of which are

11   reasonable," that provision "will be considered ambiguous." *Waller*, 11 Cal. 4th at 18, citing *Bay*

12   *Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co*., 5 Cal. 4th 854, 867, 855 P.2d 1263,

13   1271 (1993).  However, "language in a contract must be interpreted as a whole, and in the

14   circumstances of the case, and cannot be found to be ambiguous in the abstract." *Id*., citing *Bank*

15   *of the West v. Superior Court*, 2 Cal. 4th 1254, 1265, 833 P.2d 545 (1992).  "Courts will not strain

16   to create an ambiguity where none exists." *Id*. at 18-19.  For example, a term will not be

17   interpreted as ambiguous simply because the policy did not define the term.  *Powerine Oil Co. v.*

18   *Superior Court*, 37 Cal. 4th 377, 390, 118 P.3d 589, 598 (2005).  Nor is a term ambiguous when

19   there is a "'[d]isagreement concerning the meaning of a phrase,' or 'the fact that a word or phrase

20   isolated from its context is susceptible of more than one meaning.'" *Id*. quoting *Castro v.*

21   *Fireman's Fund Am. Life Ins. Co*., 206 Cal. App. 3d 1114, 1120, 253 Cal. Rptr. 833, 836 (1988).

22             Here, the one-year statute of limitations provision, in relevant part, states:  "any claim or

23   cause of action arising out of or related to use of the Service or these Terms of Service must be

24   filed within one (1) year after such claim or cause of action arose or be forever barred."  (Dkt. No.

25   47-2, 2017 TOS, p. 14-15.)  The relevant arbitration provision states:

26                    You agree that any and all disputes or claims that have arisen or may
                     arise between you and GetUpside, whether arising out of or relating
27                    to this Terms of Service (including any alleged breach thereof), the
                     Services, any advertising, any aspect of the relationship or
28

transactions between us, shall be resolved exclusively through final and binding arbitration . . . ."

(*Id*. at p. 12.)  The Court strains to understand Plaintiff's argument as to how these two provisions are in conflict or lead to ambiguity.  The provisions are essentially identical with the arbitration provision listing examples following the same broad wording.  Thus, Plaintiff's attempt to cabin advertising claims as subject only to the arbitration agreement is without force.

Accordingly, the Court concludes that the Terms, in their totality, are enforceable.

### 4.  Plaintiff's Claims are Subject to the One-Year Statute of Limitations Provision

Having determined that Upside's Terms are applicable and enforceable as to Plaintiff, the Court now concludes that all of Plaintiff's claims are subject to the Terms and that the one-year statute of limitations provision, which is extremely broad in its coverage, bars Plaintiff's claims. Essentially, the Terms apply to the parties' entire relationship, including the referral program. Plaintiff became aware of the change in Upside's Terms in November 2021.  (Dkt. No. 44, ¶ 57, 61-62.)  Eventually, "in May 2022," Upside terminated Plaintiff's account.  (*Id*. at ¶ 106.)  Even giving Plaintiff the benefit of taking this date of termination as the latest point of accrual of his claims (*i.e.* May 31, 2022), Plaintiff filed his initial complaint over a year later, on November 17, 2023.  (Dkt. No. 1.)

Plaintiff's final argument is that the continuous accrual doctrine applies at least to his unilateral contract, which would mean that those claims would be timely.  In Plaintiff's view, the fact that he is losing a monthly payment since December 2022 means each month his unilateral contract claim continues to accrue.  While the continuous accrual doctrine allows for "recurring invasions of the same right [to] each trigger their own statute of limitations," *Aryeh v. Canon Bus. Sols., Inc*., 292 P.3d 871, 880 (Cal. 2013), "if the alleged recurring injuries during the limitations period 'arose out of a single transaction' that occurred before the limitations period, the continuous accrual rule does not apply." *Garrison v. Oracle Corp*., 159 F. Supp. 3d 1044, 1083 (N.D. Cal. 2016), quoting *State ex rel. Metz v. CCC Info. Servs., Inc*., 149 Cal. App. 4th 402, 418 (2007).  Here, the Court agrees with Upside that its decision to cease paying Plaintiff referral bonuses was a "single transaction" that occurred, at the latest, on May 31, 2022.  Therefore, the continuous accrual doctrine does not apply.

**5.   The Court Will Not Allow Plaintiff Leave to Amend**

After careful consideration of Plaintiff's request for leave to amend, the Court concludes that it would be futile.  "The decision of whether to grant leave to amend . . . remains within the discretion of the district court, which may deny leave to amend due to . . . 'futility of amendment.'"  *Leadsinger, Inc. v. BMG, Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008), quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962).  As discussed above, the Court has determined that Plaintiff's attempts to suggest a possible later accrual date to be without merit.  Accordingly, the Court's conclusion that the one-year statute of limitations applies to Plaintiff's claims is insurmountable.  Thus, leave to amend would be futile, and the Court will grant Upside's motion to dismiss with prejudice.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Upside Services, Inc.'s motion to dismiss WITH PREJUDICE.

**IT IS SO ORDERED**.

Dated: September 26, 2024

_____
SALLIE KIM
United States Magistrate Judge